677 A.2d 201

IN THE MATTER OF THE SUSPENSION OR REVOCATION OF
THE LICENSE OF JOSEPH FICHNER, JR., LICENSE NO. 6213,
TO ENGAGE IN THE PRACTICE OF MASTER PLUMBING IN
THE STATE OF NEW JERSEY.

Argued March 11, 1996—Decided June 18, 1996.

*Bertram P. Goltz, Jr.,* Deputy Attorney General, argued the cause for appellant Board of Examiners of Master Plumbers (*Deborah T. Poritz,* Attorney General of New Jersey, attorney; *Joseph L. Yannotti,* Assistant Attorney General, of counsel).

*W. Peter Ragan* argued the cause for respondent Joseph Fichner, Jr. (*Blankenhorn & Ragan,* attorneys).

The opinion of the court was delivered by

O'HERN, J.

This appeal primarily concerns the de facto officer doctrine. This common-law doctrine typically holds valid the acts of a person exercising the duties of a public office under the color of authority if the acts are in the interests of the public and third persons. In this case, because three members of an occupational licensing board lacked the statutory qualifications for exercise of the office and another had not heard any of the evidence at the relevant disciplinary proceedings, the Appellate Division ordered the proceedings to commence anew. We are satisfied, in the circumstances of this case, that a reconstituted board should reconsider the charges, but we hold that it may do so on the basis of the record developed in these proceedings.

I

The claimed irregularities arose out of an administrative proceeding, conducted by the State Board of Examiners of Master Plumbers (Board), that resulted in a $35,000 fine assessed against Joseph Fichner and possible revocation of his license.

The State Plumbing License Law of 1968, *N.J.S.A.* 45:14C–1 to –27, created the Board of Examiners of Master Plumbers and authorized it to license and regulate plumbers throughout the state. The Board examines and licenses those plumbers meeting the qualifications necessary to become a "master plumber," as defined by *N.J.S.A.* 45:14C–2(a). The Board originally consisted of seven members: three master plumbers with ten years experience, one local plumbing inspector who has held such appointment for at least ten years, one journeyman plumber with ten years experience, and two representatives of the public having no association with the plumbing industry. *N.J.S.A.* 45:14C–3. The Legislature has since added two additional members to represent the interests of the public, one of which is a holder of a designated office or position in a department of the Executive Branch of the State Government that is closely related to the plumbing profession. *N.J.S.A.* 45:1–2.2(b),(c). However, because this State Government position and one of the Section 14C–3 public member positions were vacant, only a seven member Board participated in the final decision in this case.

All State occupational and professional licensing boards may penalize licensees for engaging in certain conduct, including fraud and occupational misconduct, as defined by the appropriate board. *N.J.S.A.* 45:1–21. The Board, pursuant to this authority, has promulgated regulations defining occupational misconduct. *N.J.A.C.* 13:32–1.12(c) provides that a plumber who charges excessive prices commits occupational misconduct.

Joseph Fichner, Jr., is a licensed master plumber doing business as A–1 Plumbing and Heating, Inc., of Freehold, New Jersey. The Board has twice charged Fichner with occupational miscon-

duct because of his allegedly fraudulent business practices, including charging excessive prices.

The first set of charges in 1988 involved overcharges to five customers. The Board found him guilty of occupational misconduct and fraud. The Board reprimanded Fichner, ordered restitution and fined him $5,000. Fichner appealed the decision and the Appellate Division affirmed.

The current group of charges, consisting of eight counts, was filed by the Attorney General on July 30, 1992, and focused on Fichner's conduct in dealing with seven other customers. The Attorney General alleged that Fichner engaged in fraud and occupational misconduct by charging excessive prices and by providing misleading explanations of his prices and services.

Regarding each of the seven charged incidents, the customer and Mr. Fichner presented the Board with their versions of what occurred. In addition, the Attorney General, in her capacity as Counsel to the Board, retained Robert Muller, a licensed master plumber accepted as an expert, to visit each customer's home, determine what work was done, and present his view as to the reasonableness of the charge based on the time and parts used at each job.

We compress some examples of the Board's findings. A prospective customer called A-1 Plumbing because he had received an unusually high water bill. Fichner came over and told him that the toilet was leaking and needed to be "rebuilt," at a cost of $265. The customer agreed to this price, assuming from the description "rebuilding" that the job would be quite lengthy and complicated. The job took twenty minutes and involved replacing $12 worth of parts. Muller, the State's expert, agreed with the customer's interpretation of "rebuild" as implying a complete overhaul of the toilet and testified that the use of the term was inappropriate in this case. Fichner and three of his plumbing experts, however, disagreed and stated that the term "rebuild" was appropriate to use in this context because, within the industry, it implied a

restoration of the toilet to functional use. "Remanufacture" was the appropriate term for complete overhauls.

Another customer called A–1 Plumbing after she discovered water in her basement along with smoke and a burning smell. She was hysterical and in a state of panic before Fichner arrived. He came quickly and examined the problem. He gave her an estimate of $735, and she told him to fix the problem. Fichner fixed the problem. The customer testified that Fichner did a good job but that his work took less than one hour and that he was nasty with her on the phone when she attempted to stop payment on her check. The State's expert agreed that the job should have taken not more than one hour. Fichner testified that he had given the customer an estimate in advance, worked for 2¾ hours on the problem, and was not nasty on the telephone after the customer stopped payment on her first check. However, he was upset with customers who tried to renegotiate an agreed price after he had already done the work. He could not take back the work, and customers were trying to take advantage of that fact.

A senior citizen called Fichner when she noticed a slow leak in her bathroom tub. Fichner gave her an estimate of $347. He fixed the leak in a few minutes. She then asked him about fixing a leak in her kitchen faucet. He agreed to do that for $185. When she said that she could not afford it, Fichner fixed the faucet for free. She claimed that he spent less than an hour working on both problems. The State expert allowed one hour's charge to Fichner for his work and counted $16 in parts. Muller believed that Fichner fixed the second problem, the leaking kitchen sink, simply by replacing the washer. Fichner said that he spent two hours working on the two problems, and that he used $40 in parts. There were similar disputes about the facts of each case, sometimes even between the State's expert and the complaining customers.

Both parties presented conflicting expert testimony concerning the appropriate theory to determine whether pricing was excessive and what the "appropriate" prices should have been. The

Attorney General's expert examined each complainant's home to ascertain what work was done. He then arrived at estimates of reasonable charges. He calculated that Fichner grossly overcharged each customer, often by as much as 100%. For example, he estimated that the usual and customary charge for repairing a leaking toilet (our first example) was $109, while Fichner charged $265.

Fichner sharply challenged the methodology and theory of excessive pricing used by the State's expert. Fichner presented several plumbing and accounting experts who testified that prices should be derived by calculating a number of factors, including office overhead. Those experts, and Fichner himself, concluded that even if one accepted the time and parts estimates offered by the State's expert, Fichner's fees were not excessive but simply reflected his overhead plus a profit margin ranging from negative (i.e., the job did not cover all of his overhead) to 39% profit.

The Board adopted the methodology and conclusions of the State's expert and concluded that Fichner's charges were excessive in all seven cases because they exceeded "the usual and customary price for the service rendered." In addition, the Board relied on Fichner's misleading use of the term "rebuild" and his use of illegible estimates as evidence that his conduct was fraudulent.

The Board observed that Fichner had "not changed his *modus operandi* one whit since the prior disciplinary action of this Board [was] affirmed upon appellate review." The Board assessed $5,000 in civil penalties for each of the seven violations, $35,000 in all. Additionally, the Board ordered Fichner to make restitution to each customer for the amount by which his charge was excessive, and ordered him to pay costs of $10,000 including the cost of stenography and the fee of the State's expert. Finally, the Board ordered a suspension of his license for five years, but agreed to stay the suspension if Fichner paid all of the penalties.

Fichner appealed the Board's final decision on October 1, 1993. He argued that the regulations were vague and infringed upon

freedom of contract, that one claim was barred by res judicata, and that the decision was based on erroneous factual and legal conclusions.

A year and a half later, Fichner moved before the Appellate Division for dismissal or, in the alternative, for leave to amend the appeal and expand the record. Fichner informed the court that two members had not been eligible to sit on the Board.

In early 1995, Fichner added additional information. He had discovered that a third member was ineligible. The Appellate Division ordered the State to submit "the specific credentials of each Board member who participated ... and explain how those credentials relate to the [statutory mandates.]" The Attorney General filed a brief, conceding that two members were ineligible but disputing the claim about a third member, and arguing that their votes should still be counted under the de facto officer doctrine.

The Appellate Division examined the qualifications of the Board members and found that three were ineligible to be members. 282 *N.J.Super.* 422, 426, 660 *A.*2d 545.[1] The court rejected the Attorney General's argument that the members' votes should be counted as de facto officers. It ruled:

The haphazard appointment of so many statutorily unqualified persons to a board performing such important functions displays indifference to the appointment process. This does not deserve the protective gloss of the *de facto* doctrine.

---

[1] One appointed to the position reserved by *N.J.S.A.* 45:14C–3 for a plumbing inspector with more than ten years of experience as of the date of appointment had only four years experience; one appointed to the additional public seat reserved by *N.J.S.A.* 45:1–2.2(b) for one who has no "association or relationship with the profession or a member thereof ... where such association or relationship would prevent such public member from representing the interest of the public" was the business representative for the plumbers union; another appointed to the position reserved for journeyman plumbers by *N.J.S.A.* 45:14C–2(f) was a licensed master plumber. The Attorney General argued that because the member in the journeyman position never rendered plumbing services to the public under this license, he was eligible to serve as the designated journeyman plumber. In view of the disposition we make, we need not debate the validity of this argument.

*[Id.* at 428, 660 *A.*2d 545.] [2]

The court distinguished this case from holdings in other jurisdictions "because the plain language of the appointing statute disqualified them from holding office," but conceded that other courts had not made this distinction. *Id.* at 427, 660 *A.*2d 545.

Having excluded the votes of three of the seven members, the court then determined that the vote of a fourth member could not be counted because he had not attended any of the hearings. *Id.* at 428, 660 *A.*2d 545. Using an analogy drawn from the Municipal Land Use Law, the court recognized that

> a Board member's vote is not necessarily invalidated because he or she failed to attend every single meeting at which the hearing was conducted. He or she may miss a meeting, read a transcript or listen to a recording ... and certify in writing to the Board that he or she has read the transcript or listened to the recording.
>
> *[Ibid.]*

The court noted that the member had not submitted any such certification, but decided that such a certification would have been insufficient.

> It is one thing to miss a meeting or two and be able to render a fair and impartial decision on the matter. It is quite another to miss every meeting and vote in a case in which the testimony of every lay and expert witness required an evaluation of credibility. No such evaluation could have been made by Landolfi from the cold record.
>
> *[Id.* at 429, 660 *A.*2d 545.]

The governing statute requires that a decision to discipline be by a majority of the members of the entire Board. *N.J.S.A.* 45:1–2.2(d). Of the seven members who voted for the discipline, three lacked the statutory qualifications and one was not familiar with the record. Accordingly, the court invalidated the Board's deci-

---

[2] The court rejected the Attorney General's claim that "it is too late in the day for Fichner to be raising questions concerning the statutory eligibility qualifications of Board members" because the court believed that it would be too difficult to investigate board misconduct during the hearing and it wished to allow licensees time to discover violations. 282 *N.J.Super.* at 429, 660 *A.*2d 545. However, the court warned that "by no means is our holding an invitation to others to reopen Board proceedings previously decided and no longer under appellate review." *Ibid.*

sion because it was not approved by a majority. It remanded for a hearing before a properly constituted board without considering any of Fichner's other arguments. *Id.* at 429–30, 660 *A.2d* 545.

The State sought certification, arguing that the Appellate Division erred in refusing to apply the de facto officer doctrine and in requiring members to attend hearings personally. We granted certification. 143 *N.J.* 319, 670 *A.2d* 1061 (1995).

## II

The essence of the de facto officer doctrine is that one who claims to be a public officer while in possession of an office and ostensibly exercising its functions lawfully and with the acquiescence of the public is a de facto officer whose lawful acts, so far as the rights of others are concerned, are, if done within the scope and by the apparent authority of the office, as valid and as binding as if the officer were legally qualified for the office and in full possession of it. *In re Bunker Hill Urban Renewal Project 1B of Community Redevelopment of City of Los Angeles,* 61 *Cal.*2d 21, 37 *Cal.Rptr.* 74, 389 *P.*2d 538, 552 , *cert. denied sub nom. Babcock v. Community Redevelopment Agency of Los Angeles,* 379 *U.S.* 899, 85 *S.Ct.* 185, 13 *L.Ed.*2d 174 (1964). Although rooted in antiquity,[3] the de facto officer doctrine serves the needs of contemporary society. *Clokey, supra,* 85 *Colum.L.Rev.* 1121, 1121. Like so many other principles of the common law, the doctrine is founded on tenets of practicality and convenience in the administration of justice.

The de facto doctrine is one of a number of rules ensuring the stability of governmental processes. "The acts of de facto officers are sustained because the

---

[3] Proving once again the old adage, plus ça change, plus c'est la même chose (the more things change, the more they remain the same), "[t]he de facto officer doctrine finds its earliest expression in *The Abbé de Fontaine.* [Y.B. 9 Hen. 6, f. 32, pl. 3 (1431).] In that case, a convent tried to avoid a bond obligation, claiming the abbot who guaranteed it improperly assumed office after losing the election." Kathryn A. Clokey, Note, *The De Facto Officer Doctrine: The Case for Continued Application,* 85 *Colum.L.Rev.* 1121, 1125 (1985) (footnote omitted) [hereinafter Clokey].

office is created by the public and put in operation as part of a system of organized society.... Continued administration of the office becomes necessary to the proper adjustment of its affairs and the perpetuity of the system." Without the doctrine, uncertainty would cloud every action taken by officials who had not previously demonstrated perfect title [to the office that they hold].

[*Id.* at 1131 (quoting *In re Norton*, 64 *Kan.* 842, 68 *P.* 639, 640 (1902)) (footnotes omitted).]

Our law has long recognized the existence of the de facto officer doctrine. In *Jersey City v. Department of Civil Service*, 57 *N.J.Super.* 13, 153 *A.*2d 757 (App.Div.1959), Judge Goldman traced New Jersey's acceptance of the doctrine. The question in that case was whether there can be a de facto holder of a position that has no de jure existence, that is, an office that is not in full compliance with all requirements of law. The court adopted the view of the doctrine expressed in *State v. Carroll*, 38 *Conn.* 449 (Sup.Ct.Err.1871), the leading case on the subject. " 'An officer de facto is one whose acts, though not those of a lawful officer, the law, upon principles of policy and justice, will hold valid so far as they involve the interests of the public and third persons, where the duties of the office were exercised.' " *Jersey City, supra*, 57 *N.J.Super.* at 27, 153 *A.*2d 757 (quoting *Carroll, supra*, 38 *Conn.* at 471–72). An example of when de facto office holding is recognized is when the officer holds office "under color of a known and valid appointment or election, but where the officer had failed to conform to some precedent requirement or condition, as to take an oath, give a bond, or the like." *Ibid.* (quoting *Carroll, supra*, 38 *Conn.* at 471–72).

■ The questioned members of the Board of Examiners of Master Plumbers in the within case had been duly appointed to the Board by the sitting Governor but certain requirements or conditions of office had not been met. Accordingly, they were de facto office holders.

The challenge here is almost identical to that raised in *Feinblum v. Louisiana State Board of Optometry Examiners*, 97 *So.*2d 657 (La.Ct.App.1957). In that case, the statute provided that each member of the Board be appointed from a list submitted by an

organization that had ceased to exist. The Governor, however, had been appointing members to the Board from a list that was not in accordance with the statute. The court held that the Board members were de facto officers and that the optometrist could not successfully enjoin the Board from holding any hearings on charges against the optometrist on the ground that the Board was illegally constituted. *Id.* at 663.

The *Feinblum* court noted that the de facto officer doctrine is designed to prevent disciplinary licensing proceedings from turning into contests over the qualifications of the officers, precisely what has happened in this case. *Id.* at 661–62. Unqualified officers should be removed from office by an attorney general or a claimant to the office under the prerogative writ of *quo warranto*, asking by what warrant the office is held. *Murphy v. Ellenstein*, 119 *N.J.L.* 159, 160, 195 *A.* 337 (Sup.Ct.1937). (More likely if informed of their disqualification, most would promptly resign.) The theory behind that procedure is that the office is created by the public and thus the public has the interest in the proper status of office holders.

Of course there are limits to the doctrine. One commentator has argued that "the doctrine should not apply when a qualification for a specific office aims to protect the individuals subject to that official's authority. A breach of these statutes gives individuals a sufficiently personalized injury to challenge official action on the ground of defective title [to the offices]." *Clokey, supra,* 85 *Colum.L.Rev.* at 1135. An example is in the composition of draft boards. That the registrant's draft status be determined by "neighbors" was sufficiently important to allow the title of the Board members to be raised in a collateral attack by a draft resister. *United States v. Beltran,* 306 *F.Supp.* 385, 387 (N.D.Cal. 1969).

The Supreme Court has declined to invoke the de facto officer doctrine in cases that involve "basic constitutional protections designed in part for the benefit of litigants." *Glidden Co. v. Zdanok,* 370 *U.S.* 530, 536, 82 *S.Ct.* 1459, 1465, 8 *L.Ed.*2d 671, 679

(1962); *see also Andrade v. Lauer,* 729 *F.*2d 1475, 1498 (D.C.Cir. 1984) (stating that courts should avoid interpretation of de facto officer doctrine that would likely make it impossible for parties to raise assumedly substantial constitutional claims and that would render legal norms concerning appointment and eligibility to hold office unenforceable).

■ Obviously, the error in the composition of this Board is not of constitutional dimension. However, the Appellate Division reasoned that the qualifications of the various members of the licensing board were established in part for the benefit of the litigants and that they should therefore be entitled to invoke the statutory requirements. We do not agree that the qualifications of the public member were established "for the benefit of litigants" and are not at all certain that the qualifications of the other members were established for the benefit of the licensees. In the unusual circumstances of this case, we are satisfied to let stand the Appellate Division's disposition, although we will insist in the future that challenges to the statutory composition of a board (at least insofar as entitlement to office is concerned) be made prior to the conclusion of the Board proceedings. Little effort is required to ascertain such qualifications. In *Ryder v. United States,* 515 *U.S.* ——, 115 *S.Ct.* 2031, 132 *L.Ed.*2d 136 (1995), the Supreme Court permitted a constitutional challenge to the composition of the Board of Military Review but only because the issue had been raised in a direct challenge while the case was pending before that Board, implying that a challenge such as Fichner's should have been raised before the hearing board.

■ We believe that a remand for reconsideration of the matter by a properly composed Board will serve the interests of the public and the licensee in this case. It is not necessary to conduct a new hearing in this matter. The Board may impose discipline on the basis of the existing record. "It is undoubtedly a requirement of due process that 'the one who decides must hear.' " *Pittsburgh S.S. Co. v. National Labor Relations Bd.,* 167 *F.*2d 126, 128 (6th Cir.1948) (quoting *Morgan v. United States,* 298 *U.S.* 468,

481, 56 *S.Ct.* 906, 912, 80 *L.Ed.* 1288, 1295 (1936)), *rev'd on other grounds*, 337 *U.S.* 656, 69 *S.Ct.* 1283, 93 *L.Ed.* 1602 (1949). But the requirements of due process rarely "require auditory perception of all the evidence by each board member who votes." *Feist v. Rowe*, 3 *Cal.App.*3d 404, 83 *Cal.Rptr.* 465, 474 (1970); *see also Pettiford v. South Carolina State Bd. of Educ.*, 218 *S.C.* 322, 62 *S.E.*2d 780, 791 (1950) (declaring that general rule that administrative board must consider all evidence before rendering its decision does not mean that board must itself hear evidence but it must have evidence before it and consider such evidence when rendering its decision), *cert. denied*, 341 *U.S.* 920, 71 *S.Ct.* 742, 95 *L.Ed.* 1354 (1951). "In common practice, deciding officers [at an administrative level] develop their understanding of evidence not only through reports of subordinates but especially through summaries and explanations in briefs and oral arguments of parties." *Bates v. Sponberg*, 547 *F.*2d 325, 332 (6th Cir.1976).

What is required under principles of administrative due process is "personal familiarity with the evidence on the part of responsible deciding officers and agency heads in contested-case adjudications." *Lone Star Greyhound Park v. Texas Racing Comm'n*, 863 *S.W.*2d 742, 749 (Tex.Ct.App.1993) (quotation omitted). That court relied on the Model State Administrative Procedure Act (1962), 15 *U.L.A.* § 11 at 141–42 (1990), with its requirement that agency decision makers "(1) hear the evidence, (2) read the record, or (3) entertain briefs and oral arguments following a proposal for decision...." *Lone Star, supra*, 863 *S.W.*2d at 749. Those requirements have a purpose: They are "intended to preclude 'signing on the dotted line.'" *Ibid.* (quoting 15 *U.L.A.* § 11 at 141–42 (comment)).

In *Fifth Street Pier Corp. v. City of Hoboken*, 22 *N.J.* 326, 337, 126 *A.*2d 6 (1956), the Court sustained a panel procedure used by the former Division of Tax Appeals so long as the litigants could file exceptions to any panel report and "make an impressionable contact with the powers of decision," and, in effect, correct any due process deficiency. *See also In re Morrison*, 216 *N.J.Super.*

143, 523 *A*.2d 238 (App.Div.1987) (meaningful agency review of findings of administrative law judge requires only that agency be timely supplied with parts of transcript relating to exceptions to those findings, and that agency then review those portions that relate to material issues raised by contestant's exceptions); *In re North Jersey Dist. Water Supply Comm'n,* 175 *N.J.Super.* 167, 417 *A*.2d 1095 (App.Div.) (upholding panel report procedure, wherein Water and Supply Council designated members to read and digest testimony in fifty-nine day water diversion project hearing when only four members attended over half of meetings, and no member attended all of meetings), *certif. denied,* 85 *N.J.* 460, 427 *A*.2d 559 (1980).

The members of the reconstituted Board shall read the record of the prior proceedings and, in addition, entertain briefs. The licensee insists that only a new evidentiary hearing will satisfy the requirements of due process because credibility issues are at stake. It is not at all uncommon for a reviewing court to conduct a trial de novo on the record below, as is now done in appeals from municipal courts to the Law Division under *Rule* 3:23–8(a). And although it is true that in contested administrative matters a reviewing body must give considerable deference to the actual findings of the one who hears the evidence, agency heads retain the power to make the ultimate findings of fact. *Clowes v. Terminix Int'l,* 109 *N.J.* 575, 587, 538 *A*.2d 794 (1988).

Moreover, the record in this case appears to us to lend itself to disposition on the record. We doubt that the Board will have to resolve difficult issues of fact in deciding whether Fichner's charges were reasonable. The Board may assess the methodology employed by Muller, the expert witness presented at the prior hearing. Fichner did not so much dispute the facts but rather the propriety of the Board's conclusions, relying at one point on the principles of the free-market. He believed that he could rely on the prices quoted to the customers, observing, "I mean, this is America." This case has been going on since 1992. It is in the public interest that the case be resolved with reasonable prompt-

ness. Principles of administrative due process will be satisfied by a careful assessment of the record. The extent of any penalty may be reconsidered in light of such an assessment. *In re Polk,* 90 *N.J.* 550, 449 *A.*2d 7 (1982).

As modified, the judgment of the Appellate Division is affirmed.

*For modification and affirmance*—Chief Justice WILENTZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.