789 A.2d 668 (2001)
347 N.J. Super. 279
CITY OF HOBOKEN, a municipal corporation, Plaintiff,
v.
CITY OF JERSEY CITY, Jersey City Planning Board, Jersey City Redevelopment Agency, Millennium Towers, L.L.C., and United Diversified, L.L.C., Defendants.
Coalition for a Better Waterfront and Riverview Neighborhood Association, Inc., Plaintiffs,
v.
City of Jersey City, City of Jersey City Planning Board, Jersey City Redevelopment Agency, Millennium Towers, L.L.C., and United Diversified, L.L.C. Defendants.
Superior Court of New Jersey, Law Division, Civil Part. Hudson County.
Decided March 28, 2001.
*671 Hugh B. McCluskey, Asbury Park, for plaintiff, City of Hoboken.
Michael A. Pane, Hightstown, for plaintiffs, Coalition for a Better Waterfront and Riverview Neighborhood Association, Inc.
Richard W. Wedinger for defendant, City of Jersey City, Barry, McTiernan & Moore, Jersey City, attorneys.
William J. Netchert, Jersey City, for defendant, Jersey City Planning Board, Netchert, Dineen & Hillmann, attorneys.
Francis E. Schiller, Jersey City, for defendant, Jersey City Redevelopment Agency, Schiller, Squeo & Hartnett, attorneys.
John O'Donnell, West Orange, for defendants, Millennium Towers, L.L.C. and United Diversified, L.L.C., O'Donnell, Kennedy, Vespole & Piechta, attorneys. *669
*670 FUENTES, J.S.C.
This matter comes before the court by way of plaintiffs' motion for summary judgment seeking a declaration from this court that the actions taken by defendant Jersey City Planning Board on May 9, 2000 and June 20, 2000 were ultra vires, without any legal force or effect because the term of office of five of its members had expired long before the two dates in question. Plaintiffs also allege that a sixth member's appointment was void ab initio since, throughout his tenure, he was never a resident of Jersey City. The action taken by the Board on May 9th formally recommended a series of amendments to the Jersey Avenue Redevelopment Plan (JARP) to be adopted by the municipal governing council. At the June 20th meeting the Board approved defendant Millennium Towers, L.L.C.'s[1] application for site plan approval to construct two 43 story mixed commercial/residential towers.
The underlying cause of action brought by plaintiffs is in the form of an Action in Lieu of Prerogative Writ[2] challenging these two decisions of the Planning Board based on a variety of alleged legal deficiencies. However, this court considers the legal questions raised by this summary judgment motion to present dispositive threshold issues which, if decided in plaintiffs' favor, would require that this court vacate the actions taken by the Planning Board on the dates specified. In this light, the scope of judicial review will be limited to these issues, making a comprehensive examination of the complete record of the proceedings before the Planning Board unnecessary.[3] The court *672 is further satisfied that there are no material facts in dispute and the matter is ripe for disposition as a matter of law. Brill v. The Guardian Life Insurance Company of America, 142 N.J. 520, 666 A.2d 146 (1995). R. 4:46-2.

FACTUAL FINDINGS AND PROCEDURAL HISTORY
On August 10, 1999, Millennium Towers, L.L.C. (Millennium) acquired a 3.1 acre tract between Jersey Avenue and Grove Street in Jersey City. This site is located within the Jersey Avenue Redevelopment Area (JARA) and has been designated a blighted area following the passage by the Municipal Council of a redevelopment plan pursuant to the Local Redevelopment and Housing Law, N.J.S.A. 40A:12A-1 to 49. On August 17, 1999, seven days after purchasing the site, Millennium presented an Administrative Questionnaire, a prospectus and a development plan to the Jersey City Redevelopment Agency (JCRA). Millennium submitted these documents at the request of Mr. Paul W. Hamilton, the Executive Director of the JCRA. In a letter addressed to Millennium dated August 17, 1999, Mr. Hamilton indicated that the information contained in these documents was necessary "in order to find a site suitable for your plans."
On the evening of that same day, August 17, 1999, the Board of Commissioners of the JCRA, at a regularly scheduled meeting, considered and approved Millennium's proposal for the development of a mixed use project for property located within the JARA. The minutes of the meeting reflect that the project would cost approximately $135 million. The residential units would be offered for rent, with the following projected rent schedule: One bedroom $1,000 to $1,500; two bedrooms $1,800 to $2,200; three bedrooms $2,500 to $3,200. The proposal was conceived and designed incorporating the pre-existing Light Rail connection. The proposal was the product of "dozens of meetings with NJ Transit [who] was kind enough to share their engineering plans with [Millennium]." The JCRA's final approval resolution also contained the following findings:
WHEREAS, a proposal has been made by Millennium Towers, L.L.C. for the development of residential mixed-use project for property it has under contract[4] in the Jersey Avenue Redevelopment Area between Jersey Avenue and Grove Street with the New Jersey Transit Right-of-Way generally along and forming the northerly boundary and located on Tax Block 294.5, Tax Lot P1A; and
WHEREAS, the aforementioned property is an a blighted area; and
WHEREAS, the proposed project incorporates a Light Rail Transitway ("LRT") station within it which has already been endorsed and approved as part of the residential mixed-use project by New Jersey Transit, the LRT project developer; and
WHEREAS, the proposed project includes approximately 80,000 square feet of commercial retail space located in proximity to the Light Rail Transitway Station with associated parking; and
WHEREAS, JCRA staff has evaluated the experience, capability and qualifications of the prospective redeveloper and the quality and contents of their proposal and found the proposal to be consistent with the intent and purpose of the Jersey Avenue Redevelopment Plan although the project as proposed requires *673 a modification to the current height restrictions contained in the Redevelopment Plan is necessary [sic]; and
WHEREAS, the required modification to the Jersey Avenue Redevelopment Plan necessary to accommodate the height of the proposed structures at 30 stories or 345 feet above grade is considered appropriate by the staff of the JCRA; and
WHEREAS, the designation of a developer and development of the subject lots with the proposed 350 residential dwelling units and commercial retail and Transit components with associated residential and commercial parking as proposed by Millennium Towers, LLC would be in the best interest of the City and JCRA and for the betterment of Jersey City.
The action taken by the JCRA required a formal amendment to the ordinance establishing the redevelopment area (JARA). Pursuant to the provisions of N.J.S.A. 40A:12A-7, an amendment to a redevelopment ordinance must first originate with the municipal planning board who must make a formal recommendation to the municipal governing council.
On February 9, 2000, Millennium filed an application for preliminary site plan approval with the Jersey City Planning Board. In his letter transmitting the application materials to the Planning Board, counsel for Millennium also enclosed a check in the amount of $11,847.00 for the application fee. This amount was derived by applying the following formula: 551 proposed residential units at $10.00 per unit ($5,551); 629,536 square feet of proposed non-residential space at $10.00 per 1,000 square feet ($6,292.00).
On March 14, 2000, the Jersey City Planning Board held a hearing to consider a number of proposed amendments to the JARP. The hearing was continued to May 9, 2000. Despite the specific findings made by the JCRA when it approved Millennium's proposed development project on August 17, 1999, the clear, indisputable connection between Millennium's project and the proposed amendments to the JARP, and the fact that Millennium's site plan application had been filed on February 9, 2000, and was pending before the Planning Board, Chairperson Sheehan made the following statement to the members of the public gathered that night:
I just want to remind everyone we are not speaking here of a specific application. We are speaking about amendments to a zoning ordinance. Anyone who comes into possession of that property would then be affected by the zoning ordinance. This no guarantee [sic] in any way, shape or form that a specific developer would be able to construct the examples that you have seen which I said are not a formal project, are not an application, they're before us, but the zoning framework within which that parcel can be developed. So this is not what you see is not the only possible way that site could be developed, and those decisions are made during the site plan review process when a specific application comes in for approval by the Board. Right now we're talking zoning. So try, if you can, to speak more to the zoning and the potential of what the zoning will do than a specific application.
The Planning Board voted to formally recommend the proposed amendments to the JARP and referred the matter to the municipal governing council. The official minutes reflect the following breakdown for those members in attendance:
Vote: 6-1-1
Voting in Favor: Chairman Sheehan
Commissioners Vice-Chairman Bromirski
 Commissioner Tooke
 Commissioner Sita
 Commissioner Garlin
 Commissioner McCullers
Voting Against: Commissioner Seale
Abstaining: Commissioner Holloway
*674 On June 14, 2000, the City Council adopted the amendments to the JARP recommended by the Planning Board. The amending ordinance was signed by the Mayor on June 15, 2000, and became legally effective on July 5, 2000.[5]
On June 20, 2000, two weeks before the enabling amendments to the JARP were legally effective, the Planning Board considered and approved the Millennium site plan application on a vote of 6-1-1. The motion to approve the application was made by Commissioner Sita. The vote broke down as follows:
Vice-Chairman Bromirski: Yes
Commissioner Tooke: Yes
Commissioner Holloway: Abstain
Commissioner Garlin: Yes
Commissioner Sita: Yes
Commissioner Seale: No
Commissioner McCullers: Yes
Chairman Sheehan: Yes
As of July 18, 2000, the official records in the Office of the Jersey City Municipal Clerk reflect the following roster of members and corresponding term of office for the Jersey City Planning Board.
Class I Gerald Sheehan Term Expires: June 30,1997[6]
Class II John Tooke Term Expires: June 30,1998
Class III Melissa Holloway Term Expires: June 30,1994
Class IV Christopher Garlin Term Expires: June 30,2003
Class IV William Bromirski Term Expires: June 30,1997
Class IV Scott Seale Term Expires: June 30,2001
Class IV Carmelo Sita Term Expires: June 30,1998
Class IV Jeff Kaplowitz Term Expires: June 30,2002
Class IV Arthur Williams Term Expires: June 30,2000
Class IV Rev. McCullers Term Expires: June 30,1996
Class IV Vincent Frank Term Expires: June 30,1999
It has also been stipulated by the parties that Commissioner Carmelo Sita[7] has never resided in Jersey City.
The Municipal Land Use Law, N.J.S.A. 40A:55D-23, provides for four separate Class designations and corresponding terms of office for members of Planning Boards. The terms of office vary by class designation. A Class I member shall be the mayor of the municipality or his/her designee. The term of office of a Class I member shall correspond to the mayor's official tenure. A Class II member is appointed by the mayor and must be an official of the municipality, other than a member of the governing body. A Class III member must be a member of the municipal governing body. The term of office of Class II and Class III members are for one year or terminate at the completion of their respective term of municipal office, whichever occurs first. Class IV members must be citizens of the municipality who hold no public office.[8] Class *675 IV members serve for a term of four years. The statute makes no provision for holdover members.
Plaintiffs first argue that the Planning Board lacked the legal authority to act on both the May 9, 2000 and the June 20, 2000 meeting because it lacked a quorum of legally authorized, duly appointed members. They cite three provisions within the Municipal Land Use Law for support. N.J.S.A. 40:55D-5 defines "Municipal Agency" to include a municipal planning board. N.J.S.A. 40:55D-6 defines "Quorum" as the majority of the fullauthorized membership of a municipal agency. Finally, N.J.S.A. 40:55D-9(a) provides that "No action shall be taken at any meeting without a quorum being present." Jersey City's Planning Board, established by ordinance, consists of nine members. Therefore, five members are needed to constitute a quorum.
It is undisputed that the terms of office of four out of the six members voting in favor of recommending amendments to the JARP ordinance on May 9, 2000, had long expired. Commissioner Tooke's term had expired over two years (1998); Vice-Chairman Bromirski's term had expired over three years (1997); Commissioner Rev. McCullers' term had expired over four years (1996); and Commissioner Frank's term expired over three months (1999). Furthermore, although voting to abstain, Commissioner Holloway's term had also long expired (1994). As to Commissioner Sita, not being a resident of Jersey City, he was never eligible for appointment as a Class IV member. N.J.S.A. 40:55D-23(a) clearly states that "All members of the planning board, except for the Class II members... shall be municipal residents." Therefore, his "membership" on the Planning Board was void ab initio. His appointment was an ultra vires act, since, as a non-resident, the Mayor was utterly without legal authority to appoint him. Casamasino v. City of Jersey City, 158 N.J. 333, 730 A.2d 287 (1999). This translates into the following outcome: six out of the eight members present on May 9, 2000, were not lawful, bona fide members of the Planning Board. A similar outcome applies as to the June 20, 2000 meeting where Millennium's site plan application was approved.
Notwithstanding these findings, Millennium argues for this court to uphold the validity of the Planning Board's actions by applying the de facto officer doctrine. In Petrick v. Planning Board of the City of Jersey City, 287 N.J.Super. 325, 671 A.2d 140 (App.Div.1996), the court held that because two members of the Board may have been appointed in violation of N.J.S.A. 40:55D-23(a), in that they were classified as Class IV members when they should have been Class II, they nevertheless were de facto members, and their participation in voting in favor of Christ Hospital's site plan application did not invalidate the Board's actions approving it. In so doing, the court reiterated the principles of the doctrine:
A de facto officer is one: whose acts, though not those of a lawful officer, the law, upon principles of policy and justice, will hold valid so far as they involve the interests of the public and third persons, where the duties of the office were exercise, under color of a known election or appointment, void because the officer was not eligible, or because there was a want of power in the electing or appointing body, or by reason of some defect or irregularity in its exercise, such eligibility, want or power, or defect being unknown *676 to the public. Id at 333, 671 A.2d 140 (citations omitted).
As a promoter of public policy, the de facto officer doctrine is intended to ensure the stability of governmental processes. In the Matter of Fichner, 144 N.J. 459, 677 A.2d 201 (1996).
The acts of de facto officers are sustained because the office is created by the public and put in operation as part of a system of organized society... Continued administration of the office becomes necessary to the proper adjustment of its affairs and the perpetuity of the system. Without the doctrine, uncertainty would cloud every action taken by officials who had not previously demonstrated perfect title (to the office they hold.) Id at 467, 677 A.2d 201.
The Fichner court acknowledged, however, that the doctrine's application is not without limits. Exceptions have been recognized in cases where "A breach of these statutes gives individuals a sufficiently personalized injury to challenge official action on the ground of defective title to offices." Id at 469, 677 A.2d 201. The Court cited as an example the composition of local draft boards. United States v. Beltran, 306 F.Supp. 385 (N.D.Cal.1969). The doctrine has also been denied in cases invoking "basic constitutional protections designed in part for the benefit of litigants." Fichner at 470-71, 677 A.2d 201 citing Glidden Co. v. Zdanok, 370 U.S. 530, 536, 82 S.Ct. 1459, 1465, 8 L.Ed.2d 671, 679 (1962). In Casamasino v. City of Jersey City, supra, the Supreme Court once again reviewed and reaffirmed the de facto officer doctrine by making legally binding the actions of a de facto tax assessor as they pertained to the municipality and third parties. However, the Court refused to extend the doctrine to confer tenure status upon the tax assessor, recognizing that certain statutory prerequisites had not been satisfied.
A review of the cases where the de facto doctrine has been invoked reveals a consistent theme. Most involved a good faith, yet legally mistaken belief that the individuals serving had been properly appointed or elected. Gillson v. Heffernan, 40 N.J. 367, 192 A.2d 577 (1963) (legal uncertainty as to the date for determining term of Class IV members of local planning board under the Municipal Planning Act of 1953); Saverino v. Zboyan, 239 N.J.Super. 330, 571 A.2d 327 (App.Div.1990) (Legal uncertainty as to terms of incumbent Class IV members of planning and zoning boards resulting from modifications to the township's Faulkner Act charter.) State v. Jones, 185 N.J.Super. 285, 448 A.2d 495 (App.Div.1982) (municipal judge issuing warrant under the good faith belief that he was included in cross-assignment order); Township Committee of Edgewater Park v. Edgewater Park Housing Authority, 187 N.J.Super. 588, 455 A.2d 575 (Law Div.1982) (housing authority commissioner's good faith yet legally mistaken belief that his term of office began on the date reflected in Mayor's certificate of appointment.); Lang v. Mayor of City of Bayonne, 74 N.J.L. 455, 68 A. 90 (Ct.E.A.1907) (municipal corporation created in good faith by an unconstitutional law).
In cases involving boards where no plausible explanation for the legal defect is reflected in the record, the number of legally defective members has been small relative to the size of the board and there non-participation would not have rendered the board unable to function. In the Matter of Fichner, supra, (three ineligible members out of a seven member board); Petrick v. Planning Board of the City of Jersey City, supra, (a case involving this same Planning Board, two ineligible members out of nine).
*677 Against this backdrop this court will now focus on the facts at bar. On the dates in question, May 9, 2000 and June 20, 2000, six out of the nine seating members of the Jersey City Planning Board were not functioning in a de jure capacity. This situation was allowed to exist for a period of years. During the course of oral argument, this court asked counsel for both Jersey City and the Planning Board for an explanation as to why such a state of affairs was allowed to continue year after year without redress. No explanation was given. In this light, this court concludes that this situation was not brought about by either a good faith misunderstanding of the facts or a reasonable uncertainty as to the state of the law. The expiration date of the term of office of each Class member was clearly set out in the records of the Municipal Clerk. The residency requirement for Class IV members is clearly set out in N.J.S.A. 40A:55D-23(a). The statute has been in existence since 1976 and was last amended in 1990. The failure of the Mayor to fill these vacancies as the term of office expired or, as in the case of Commissioner Sita, to appoint individuals who meet the legal residency requirement, can only be attributable to a deliberate plan to frustrate the Legislative plan embodied in the Municipal Land Use Law.
This court has made specific factual findings documenting the scale, magnitude and financial significance of the Millennium development project. This project required coordination, input and action from three separate municipal agencies, the Jersey City Redevelopment Agency, the municipal governing Council and the Planning Board. Given its proximity, plaintiff City of Hoboken, has asserted a legal challenge, alleging, among other things, that the impact of the project on its own municipal resources has not been duly considered. Defendant Jersey City has granted Millennium a 20 year, long term tax exemption.[9]
Local governments have the power to zone only through legislative delegation of the State's police power. Lusardi v. Curtis Point Property Owners, 86 N.J. 217, 430 A.2d 881 (1981). Municipal use of this power must be consistent with the standards and provisions of the Municipal Land Use Law. Taxpayers Association of Weymouth Township v. Weymouth, 80 N.J. 6, 364 A.2d 1016 (1976). The indifference to, indeed outright contempt for the statutory requirements of the Municipal Land Use Law shown by the appointing authority of Jersey City, as it relates to the composition of the Planning Board, cannot find judicial countenance through a mechanical application of the de facto officer doctrine. In Andrade v. Lauer, 729 F.2d 1475 (D.C.Cir.1984), a group of dismissed federal employees challenged a Department of Justice Reduction in Force program. The plaintiffs alleged that the administrators of the program had been appointed in violation of the constitutional requirement that Presidential nominations be confirmed by the Senate. U.S. Const. Art. II, § 2. The Circuit Court of Appeals held that plaintiffs' legal challenge was not barred by the de facto officer doctrine. The doctrine gave "no weight to the public interest in enforcing legal norms concerning eligibility and appointment to office and individuals' interests in having the government act against them only *678 through lawfully appointed agents." Id at 1499.
This court is mindful of our Supreme Court's admonition in Fichner. In affirming the appellate court which had previously found that:
The haphazard appointment of so many statutorily unqualified persons to a board performing such important functions displays indifference to the appointment process. This does not deserve the protective gloss of the de facto doctrine. 282 N.J.Super. 422, 428, 660 A.2d 545 (App.Div.1995)
The Fichner court stated:
In the unusual circumstances of this case, we are satisfied to let stand the Appellate Division's disposition, although we will insist in the future that challenges to the statutory composition of a board (at least insofar as entitlement to office is concerned) be made prior to the conclusion of the Board proceedings. Little effort is required to ascertain such qualifications. Id at 471, 677 A.2d 201.
This court finds the circumstances of this case to be significantly more egregious than those confronted by the Court in Fichner. As previously noted, these legally defective conditions were allowed to exist for years. The number of members affected, 66% of the Board's compliment, signifies a wholesale disregard for the statutory guidelines establishing the terms of office for individual members. This also impugns the independence of the Planning Board as envisioned by the Legislature when it adopted the Municipal Land Use Law. Without fixed terms of office, members are reduced to an "at will" status, serving at the pleasure of the Mayor. While local zoning decisions are not completely insulated from political considerations, they cannot be rendered wholly subservient to them by the failure of the Mayor to abide by the law.
Although, as noted by the Fichner Court, from the point of view of the plaintiffs, "little effort [was] required to ascertain such qualifications" during the course of hearings, defendant, City of Jersey City, has a greater statutory duty to make timely, legally qualified appointments, and prevent the legally deteriorated state the Planning Board found itself in on May 9, and June 20, 2000.
Turning now to the question of quorum, as earlier noted, since Jersey City created by ordinance a nine member Planning Board, five members are needed to constitute a quorum. N.J.S.A. 40:55D-6. This court holds that defendant Planning Board lacked a quorum of bona fide, legally appointed members during the meetings of May 9, and June 20, 2000. Since N.J.S.A. 40:55D-9(a) provides that "No action shall be taken at any meeting without a quorum being present," the action taken at the May 9, 2000 meeting formally recommending an amendment to the Jersey Avenue Redevelopment Plan and referring the matter to the municipal governing council is hereby vacated and rendered without legal force or effect. A similar result applies to the action taken on June 20, 2000. There again the Board lacked a quorum of bonafide, legally appointed members. Therefore, the action taken by the Board on June 20, 2000, approving Millennium's site plan application is likewise vacated and rendered without legal force or effect.
Impact on Defendant Millennium
Millennium, on the hand, stands in a different light. There is no evidence before this court that this defendant knew of the Planning Board's legally defunct status at any time prior to the commencement of this legal action. The essence of the de facto officer doctrine is the protection of innocent third parties who reasonably *679 rely on the apparent authority of governmental officials, acting within the scope of their official duties and under color of law. Casamasino v. City of Jersey City, supra; Petrick v. Planning Board of the City of Jersey City, supra. However, the doctrine should not act as a shield for the government or its officials to hide behind. This court is satisfied that the circumstances of this case constitute such a wanton disregard for the rule of law as to warrant this aberrational departure from the strict application of the doctrine.
Millennium is nevertheless entitled to some relief. The de facto officer doctrine is an ancient equitable remedy with historical roots dating back to the feudal courts of Europe. It has been part of our State's common law for more than a century. Erwin v. Jersey City, 60 N.J.L. 141, 37 A. 732 (E & A 1897.) Judges sitting in a court of equity are permitted wide latitude in drafting an appropriate remedy providing they employ "principles of fairness, justice, and the law" in vindicating the wrong before them. Graziano v. Grant, 326 N.J.Super. 328, 342, 741 A.2d 156 (App.Div.1999). "Equity will not permit a wrong to be suffered without affording the appropriate remedy." Id. citing Roberts v. Roberts, 106 N.J.Super. 108, 109, 254 A.2d 323 (Ch.Div.1969). "Equity regards that as done which ought to be done." Wohlegmuth v. 560 Ocean Club, 302 N.J.Super. 306, 312, 695 A.2d 345 (App.Div.1997).
In crafting an equitable remedy to fit the highly unusual circumstances of this case, this court must examine and weigh the right of Millennium to rely upon the decision rendered by the Jersey City Planning Board in approving the site plan application for the Millennium Towers project against the public policy interest of encouraging municipal public officials to follow the laws enacted by the Legislature. The only ascertainable injury sustained by Millennium thus far is limited to the costs incurred in the prosecution of its site plan application before the Planning Board and the legal fees associated with the defense of this action. The decision of this court herein does not, of course, preclude Millennium for re-presenting its site application at some future date, this time before a legally constituted Board.[10] In this light, an order from this court directing defendant Jersey City to make Millennium economically whole in these two areas would at least restore Millennium to the financial position it was in prior to the commencement of this action. Such an order also serves as a deterrent for any similar future misconduct.
This approach creates a hybrid equitable remedy borrowing from both the doctrine of equitable estoppel and the de facto officer doctrine. "The doctrine of equitable estoppel prevents a party from repudiating prior conduct if such repudiation `would not be responsive to the demands of justice and good conscience.'" Davin, L.L.C. v. Daham, 329 N.J.Super. 54, 67, 746 A.2d 1034 (App.Div.2000), citing Carlsen v. Masters, Mates & Pilots Pension Plan Trust, 80 N.J. 334, 339, 403 A.2d 880 (1979). "The effect of the doctrine is to create, from motives of equity and fair dealing, opposing rights for the party seeking to obtain the benefit of the estoppel." Id. Although equitable estoppel is rarely invoked against a government entity, it will be applied in an appropriate situation so long as the application of the doctrine does not prejudice an essential *680 government function. Middletown Policemen's Benev. v. Tp. of Middletown, 162 N.J. 361, 367, 744 A.2d 649 (2000). "Equitable estoppel may be invoked against a municipality 'where interests of justice, morality and common fairness clearly dictate that course.'" Id., citing, Gruber v. Mayor and Twp. Comm. of Twp. of Raritan, 39 N.J. 1, 13, 186 A.2d 489 (1962).
In Palatine I v. Planning Board Township of Montville, 133 N.J. 546, 559-60, 628 A.2d 321 (1993), the court articulated the circumstances warranting the application of the Doctrine of Equitable Estoppel against a municipality.
We have applied the doctrine of equitable estoppel in a number of cases between builders and municipalities.... We have held that when a permit is issued validly or in good faith and the builder has justifiably and in good faith relied on it to his substantial detriment, the municipality is estopped from revoking the permit absent fraud. When the permit was invalidly issued without even a semblance of compliance with the relevant ordinances, however, estoppel will not apply even if there has been reliance. (Emphasis added.)
The public policy statement articulated by the court in Palatine continued the reasoning expressed in a long line of cases which have sought to balance the public interest in an orderly and lawful administration of zoning policy against the reasonable and justifiable expectations of developers seeking municipal authorization to build. As the court stated in Gruber, supra at 15, 186 A.2d 489, "the ultimate objective [is] fairness to both the public and the individual property owner."
Counsel for the Planning Board has also argued that if the court holds in this case that the Board lacked the legal capacity to conduct business due to an absence of quorum, it would open the flood gates of legal challenges to the hundreds of other cases decided by the Board over the past several years. In support of this dooms day scenario counsel for the Board has submitted the certification of the Board's Secretary, Robert D. Cotter, attesting that during the period of June 1998 through January 2001 the Board processed 375 development applications and approved "two to three billion dollars worth of development at over one hundred hearing dates."[11] Mr. Cotter concludes that: "if the Court were to determine that the Board actions [sic] since 1998 were invalid, it would create utter chaos within the Division of Planning of the City of Jersey City and throughout the development community." Counsel and Mr. Cotter's fears are legally unfounded. Actions in Lieu of Prerogative Writ to review a determination of a planning board must be commenced "no later than 45 days after the accrual of the right to the review, hearing or relief claimed." R. 4:69-6(a). Any past decision of the Board that falls outside of this jurisdictional window is not susceptible to collateral attack by this court's ruling.[12]DeHart v. Bambrick, 177 N.J.Super. 541, 427 A.2d 113 (App.Div. 1981).
*681 I am aware that the decision reached herein represents a significant departure from established precedent. Nevertheless, I am convinced that this ruling represents a just and equitable result and reaffirms the rule of law as a guiding principle for judicial decisions. This point was best expressed by the words of Justice Pashman in his dissent in Yanhko v. Fane, 70 N.J. 528, 362 A.2d 1 (1976), overruled by Stewart v. 104 Wallace Street, Inc., 87 N.J. 146, 432 A.2d 881 (1981).
"My disagreement with the majority transcends its assessment of the rights and duties of commercial landowners, and extends to the undue reliance which the majority places on precedent. I, of course, recognize the important role which precedent plays in the ongoing development of the law. Precedents provide a useful summary of the past and a helpful directive for the future. Nonetheless, while past judicial decisions may afford guidance to courts, they are only a starting point for judicial inquiry. They are only a means and not an end of our decision-making process. As Justice Cardozo stated in his seminal work, The Nature of Judicial Process (1921); `the rules and principles of case law have never been treated as final truths, but as working hypotheses, continually retested in those great laboratories of the law, the courts of justice. Every new case is an experiment; and if the accepted rule which seems applicable yields a result which is felt to be unjust, the rule is reconsidered. It may not be modified at once, for the attempt to do absolute justice in every single case would make the development and maintenance of general rules impossible; but if a rule continues to work injustice, it will eventually be reformulated. The principles themselves are continually retested; for if the rules derived from a principle do not work well, the principle itself must ultimately be reexamined.'" (Id at 23.) Id at 545-46, 362 A.2d 1.
1) Defendant Planning Board of the City of Jersey lacked a quorum of bona fide, legally appointed members during the meetings of May 9 and June 20, 2000.
2) N.J.S.A. 40:55D-9(a) provides that no action shall be taken by a municipal planning board at any meeting without a quorum being present.
3) The action taken by the Planning Board of the City of Jersey at the May 9, 2000 meeting formally recommending an amendment to the Jersey Avenue Redevelopment Plan and referring the matter to the municipal governing council is hereby vacated and rendered without legal force or effect.
4) The action taken by the Planning Board of the City of Jersey on June 20, 2000, approving defendant Millennium Towers, L.L.C.'s site plan application is vacated and rendered without legal force or effect.
5) Judgment is entered against defendant City of Jersey City ordering and directing it to pay defendant Millennium Towers, L.L.C.'s costs incurred in the prosecution of its site plan application before the Jersey City Planning Board and the legal fees associated with the defense of this action.
NOTES
[1] The applicant/developer is actually comprised of two separate corporate entities, Millennium Towers, L.L.C. and United Diversified, L.L.C.
[2] Plaintiffs brought two separate actions, City of Hoboken v. City of Jersey City, et als., and Coalition for a Better Waterfront, et als. v. City of Jersey City, et als. The two cases have been consolidated and will be jointly examined and decided herein.
[3] The court is aware that judicial review of an administrative agency's determination based on both quasi-legislative and quasi-judicial functions should ordinarily include the entire record of the proceedings below. Hirth v. City of Hoboken, 337 N.J.Super. 149, 766 A.2d 803 (App.Div.2001). However, in this case, a limited review is warranted since adjudication of the threshold issues presented would effectively dispose of the case.
[4] This finding is at odds with the stipulated facts before the court that Millennium had acquired the property at issue seven days before on August 10, 1999.
[5] See N.J.S.A. 40:69A-181(b).
[6] Although the Municipal Clerk's records reflect the term of office as ending in 1997, the designation as a Class I member makes the term office coterminous with the Mayor's tenure. In this capacity, Mr. Sheehan serves at the pleasure of the Mayor. N.J.S.A. 40:55D-23(b). Thus, there is no evidence before this court that Mr. Sheehan was not functioning under a de jure membership status.
[7] Plaintiffs have also challenged the actions of the Planning Board with respect to Commissioner Sita's alleged conflict of interest as it relates to the Millennium project. The court has authorized limited discovery in this area and will not address the issue here.
[8] Although not germane to the issues raised herein, in the case of nine member Boards, one Class IV member may also be a member of the zoning board of adjustment or historic preservation commission, and one other may be a member of the board of education. N.J.S.A. 40:55D-23 (a).
[9] On January 22, 2001, in the case of Millennium v. Jersey City, Docket No. HUD-L-7415-00, this court held that Jersey City Ordinance #00-112 granting Millennium a 20 year tax abatement pursuant to N.J.S.A. 40A:20-1 et. seq., the Long Term Tax Exemption Law, was not subject to the provisions of the Initiative and Referendum Law, N.J.S.A. 40:69A-184 et. seq. The decision was appealed and is currently pending before the Appellate Division.
[10] Although not part of the written record, counsel have all represented that the Mayor has, during the pendency of this action, made the necessary appointments to bring the Planning Board to its full compliment of nine.
[11] These figures are not supported by any actual documentation from or compilation of Planning Board's records. Ironically, if accepted as true, these figures only serve to support this court's position that this important public business be carried out by duly appointed public officials, serving consistent with the rule of law.
[12] While the rule empowers the court to enlarge the time period for commencing a Prerogative Writ action when it is manifest that the interest of justice so requires, exercise of this judicial discretion is limited to three areas: (1) when an important and novel constitutional question is involved; (2) to review informal or ex parte determinations of legal questions by administrative officials which do not involve "a sufficient crystallization of a dispute along firm lines to call forth the policy of repose" and where the right to relief depends upon determination of a legal question; and (3) where an important public rather than a private interest is involved which requires adjudication or classification. Schack v. Trimble, 28 N.J. 40, 48, 145 A.2d 1 (1958); Brunetti v. New Milford, 68 N.J. 576, 586, 350 A.2d 19 (1975).