THE STATE, HORACE SCHERMERHORN, JR., PROSECUTOR, v. THE MAYOR AND ALDERMEN OF JERSEY CITY.

The act concerning wards and district lines in cities of this state, approved May 9th, 1889 (*Pamph. L., p.* 442), requiring that three-fourths of all the members of the legislative body shall agree to the passage of an ordinance to effect changes, means three-fourths of the entire body.

---

On rule to show cause for *certiorari* to remove redistricting ordinance.

Argued at June Term, 1890, before Justices DEPUE, VAN SYCKEL and SCUDDER.

For the prosecutor, *Collins & Corbin*.

For the defendant, *R. S. Hudspeth* and *W. D. Edwards*.

The opinion of the court was delivered by

SCUDDER, J.   On April 20th, 1890, the aldermen of Jersey City passed an ordinance, which was approved by the mayor May 1st, 1890, "to divide Jersey City into aldermanic districts and to change the lines and boundaries of the present aldermanic districts." It is recited therein that it was done under the authority of an act entitled "An act concerning wards and district lines in cities of this state," approved May 9th, 1889. *Pamph. L., p.* 442.

This act authorizes a change to be made in such lines and boundaries once in five years, *provided*, that three-fourths of all the members of said legislative body shall agree to the passage of said ordinance, and the same shall be approved by the mayor of said city. The legislative body referred to is described as "the common council, board of aldermen, or other legislative body of any city of this state."

This ordinance was passed by the votes of the aldermen from the First, Second and Fourth districts (two each), and

by one alderman of the Third and one of the Sixth district, and by the president of the board. One alderman of the Fifth and another from the Sixth district voted against it; one was absent and one resigned, by reason of long continued sickness, at the opening of the meeting when the ordinance was passed, and before any vote was taken thereon. It thus appears that there were nine votes in favor of the ordinance, including the president's, two against, and two members not voting.

By the charter of Jersey City (section 13) there are two aldermen in each district (*Pamph. L.* 1871, *p.* 1102), making twelve in the six districts into which that city is divided.

By the act entitled "An act concerning the government of cities of this state" (*Pamph. L.* 1889, *p.* 187, § 23), it is enacted "that in every city there shall be elected an officer, to be known as president of the board of aldermen therein, who shall be the president of and shall so act at the meetings of the principal legislative body of said city, whether the same shall be called the board of aldermen, or the common council thereof; but such boards shall have power to designate one of their number to act in case of the absence or disability of the president; said president shall serve two years, and shall be elected at the first municipal election after the passage of this act, and thereafter one shall be elected every two years, and, in addition, he shall have all the powers of an alderman of the city in which he is elected," &c.

This appointment can be read in no other way than that, in addition to acting as president at the meetings of the board of aldermen, he shall have all the powers of an alderman of the city.

Under section 25 of the charter every alderman has the power to make arrests as a peace officer; but his main powers are legislative, under section 24, which defines the particular cases in which they shall be exercised. There is no exclusion of his vote, except in case of a tie, as is provided in some acts creating a presiding officer, but without exception he can act as other aldermen by the terms of this statute. This is

the obvious meaning, and there is reason for his voting in a board where there is an even number of voters, when all the aldermen of the respective wards are present, to prevent delay and embarrassment by a tie vote. There may be something also in the idea of having one member who shall be regarded as acting for the people of the city collectively, both presiding and using his influence in voting as their representative. Whatever may be the reason, he is designated as a constituent member of the board of aldermen, with all the powers of an alderman. Instead of approving their action, he acts with them. *Halsted* v. *State*, 12 *Vroom* 552, 588.

This same section (23) provides " that the first president of the board of aldermen shall be elected at the election to be held in any such city, under section 33 of this act, for the acceptance or rejection of this act." This election was held, the charter act was accepted, a president was chosen and he was acting as such at the time the vote in controversy was taken. The board of aldermen, when full and complete, consisted of thirteen members, including the president. The nine members voting in favor of the ordinance were not three-fourths of the entire board. But the defendant contends that the act of 1889, giving the right to redistrict the city, is fulfilled when an ordinance is passed by the votes of three-fourths of the sitting, acting members at the time the vote is taken; that if any of the members die, resign, remove or are disqualified, the remaining members are the unit by which the fraction of three-fourths shall be determined.

In this case one member resigned on the same night when the ordinance was passed. There is no doubt in my mind that this resignation was legally effected. Section 13 of the charter says, that if any person so elected shall, during his term of office, file with the city clerk written notice of the resignation of his office, his office shall thereby become vacant. Before the vote was taken this written notice had been delivered to the clerk, and marked filed by him at the beginning of the meeting; it was accepted by a vote of the board, and his office was vacant. The actual number of

members was reduced to twelve, and three-fourths of that number voted for the ordinance. This brings us to consider what number of members is intended by this law. If the words are interpreted as they are written, there will be no difficulty in deciding this question. The law contemplates the formation of a legislative body of thirteen men for the government of this city. When spoken of collectively, this must be the understanding. When not controlled by express words in the charter, their actions will be governed by the common law rule. This rule is, that there is a distinction taken between a corporate act to be done by a select and definite body, as by a board of directors, and one to be performed by the constituent members. In the latter case, a majority of those who appear may act; but in the former, a majority of the definite body must be present, and then a majority of the quorum may decide. This is the general rule. 2 *Kent Com.* 293; *Willcock's Case*, 7 *Cow.* 402, 405; *Dane Abr.* 150; *Craig* v. *First Presbyterian Church*, 88 *Penna. St.* 42; *County of Cass* v. *Johnston*, 95 *U. S.* 360; 1 *Dill. Mun. Corp.* *278; *Cooley Const. Lim.* *141.

But the matter of dividing cities into wards and changing district lines in cities was regarded as so important that more than a majority of a quorum, and more than a majority of members, were required to effect these changes in the representation of the people living in cities. The law therefore says, that three-fourths of all the members of said legislative body shall agree to them. An extreme case, showing the position in which a city might be placed if the construction put upon this statute by the defendant were adopted, and there were several vacancies by death, removal or resignation, is found in *King* v. *Bellringer*, 4 *T. R.* 810, where the charter required that the mayor and common clerk and the common council for the time being, or the major part of them, should elect all the officers and ministers of the borough; and the common council was a definite body, consisting of twenty-six; it was held that a majority of the whole number must meet to form an election assembly; and that if the corpora-

tion be so reduced that so many do not remain, no election can be had at all. It was then contended that the major part of them must mean the major part for the time being, or of the existing corporation. Lord Kenyon, in delivering the opinion of the court, quotes Lord Mansfield in *Rex* v. *Mundy, Cowp.* 537, who asked the question : " Is there any case where the charter has directed the election to be by the majority of the body in which it has been held that a less number than a majority of the whole corporation can elect? For instance, suppose the corporate body consisted of twelve and two were dead, is there any instance where the charter has said that the election shall be by a majority of the body in which it has been held that six, which are a majority of the remaining ten, were sufficient to elect ?" He says further, that the cases referred to in that case underwent, perhaps, more discussion than any case agitated at that time, and concludes with the words: "And we do not find a single decision in opposition to all the cases, considering that this election should be made by a select definite body." *King* v. *Miller*, 6 *T. R.* 269, by the same court, approves their former decision.

Cases can be found running in the line of these old decisions, but it is useless to cite them further, with the plain words of this law before us. "Three-fourths of all the members of said legislative body" mean the complete board, the full membership, not a reduced number of members as they are at the time of voting.

In the constitution of our state, giving the authority by which this statute was passed, it is declared, in article IV., section 4, paragraph 6, " that no bill or joint resolution shall pass unless there be a majority of all the members of each body personally present and agreeing thereto." If it had said three-fourths of all the members of said body shall agree, it would correspond with the present statute, and there would be no hesitation in saying that three-fourths of the entire membership must agree to enact a valid law. Such has always been the construction and must continue to be followed. Our house of assembly is composed of

sixty members and the senate of twenty-one members. In the one case the votes of thirty-one, and in the other the votes of eleven members are essential to the passage of a bill or joint resolution.

A plausible argument has been made for a difference of meaning, by citing from the charters of several cities the words used in giving the power for expulsion of members, and for passing ordinances over the veto of the mayor, in which two-thirds, or a majority of "all the members" and "all the members elected" have been used, as if a different intention was thereby expressed. The number of members elected may not always equal all the members of the legislative body, so that the defendant's argument gains nothing by the comparison of these terms. As the expulsion of members and the passing of laws without the sanction of the executive are equally important, though not, perhaps, equally frequent, exercises of legislative authority, no satisfactory reason can be given for enlarging the number of members who shall act in either case; and without a clear expression none will be intended.

In *Stanton* v. *Hoboken*, 23 *Vroom* 88, where this court was called upon to construe the charter of Hoboken, which enacts that if, after the veto of an ordinance by the mayor, two-thirds of the members of the common council elected shall pass the same, it shall take effect as a law, where one of the eight elected members had died, it was held that six were required to pass the ordinance. The law of 1888 (*Pamph. L.*, p. 116) was in that case, but not in a form to call for a direct decision upon it, but the opinion is expressed that this statute, which requires a vote of two-thirds of the members to divide wards in Hoboken, will demand the same construction, and includes the whole body.

This interpretation of the law is exact, reasonable and in consonance with authority. The rule to show cause will be made absolute, and in the case submitted, as if here upon the return of the writ, the ordinance will be vacated and judgment given for the prosecutor, with costs, including printing.