961 A.2d 770 (2008)
404 N.J. Super. 337
William M. CAMPBELL, Plaintiff-Respondent,
v.
BOROUGH OF NORTH PLAINFIELD, North Plainfield Borough Council, Mayor Janice Allen and Council President Nathan Rudy, Defendants-Appellants.
DOCKET NO. A-0526-07T3.
Superior Court of New Jersey, Appellate Division.
Argued September 22, 2008.
Decided December 24, 2008.
*771 Philip G. George argued the cause for appellants (Eric M. Bernstein & Associates, L.L.C., Warren, attorneys; Mr. George, on the brief).
William M. Campbell argued the cause pro se.
Before Judges LISA, REISNER and SAPP-PETERSON.
The opinion of the court was delivered by
LISA, P.J.A.D.
The validity of the land use ordinance in this case hinges on the applicability of the protest provision, N.J.S.A. 40:55D-63, of the Municipal Land Use Law (MLUL), *772 N.J.S.A. 40:55D-1 to -163.[1] The Borough of North Plainfield adopted an ordinance, in accordance with a recommendation in a periodic reexamination of its Master Plan, creating a new zoning district. Plaintiff and others had filed a valid protest. At the time of enactment, North Plainfield's seven-member governing body had one vacancy in office. The ordinance was adopted by a vote of four to two. In separate, unrelated litigation, it had been determined that the vacancy could not be filled until the succeeding general election. See Carley v. Borough of N. Plainfield, 380 N.J.Super. 240, 881 A.2d 798 (Law Div.2005). In this case, North Plainfield argued that (1) the protest provision, which requires "the favorable vote of two-thirds of all the members of the governing body," did not apply because the ordinance was the product of the recent Master Plan reexamination, and (2) even if the protest provision applied, the "judicially created" vacancy should not count in calculating the required two-thirds vote to adopt a land use ordinance over protest, as a result of which four out of six votes satisfied the two-thirds requirement.
Further, North Plainfield subsequently adopted another ordinance, similar to the first one but with some modifications. It argued that the subsequent ordinance, which passed by a six to zero vote, constituted a complete reenactment of the first ordinance, not merely an amendatory ordinance. Therefore, according to North Plainfield, the subsequent ordinance superseded and rendered moot any procedural deficiency in the adoption of the first ordinance.
The trial court rejected North Plainfield's complete reenactment argument and concluded that the subsequent ordinance was an amendatory ordinance, the validity of which depended on the validity of the first ordinance. The trial court also rejected North Plainfield's other arguments. It found the protest provision applicable and held that five votes, representing two-thirds of the full statutorily-authorized membership of the governing body, was required to lawfully adopt the ordinance. The court therefore declared the initial ordinance invalid. We agree and affirm.

I
The North Plainfield Planning Board undertook a general reexamination of the Master Plan in 2001, see N.J.S.A. 40:55D-89, culminating in the adoption of a report on August 28, 2002. The report recommended changes for the land use element, including the development, within the residential district, of "senior housing at appropriate locations to meet future needs of the Borough population." The plan explained that the municipality's population, as the national population, was aging and there was a need within the Borough for "the creation of senior communities, ages 55 and up, through to the production of assisted living/congregate care complexes." The plan recommended the creation of "a senior housing, age restricted zone." The plan identified a seventeen-and-one-half acre property, known as the Villa Maria parcel, the site of a Roman Catholic convent, as "the largest single parcel in the Borough ripe for redevelopment at this *773 stage in the Borough's history," and the perfect location for the new zone designation.
The Borough Council moved to implement this recommendation with the creation, by Ordinance No. 05-22, of a new zone, designated as "R-9 Age Restricted Community (ARC) Residence Zone." Permitted uses were limited to those permitted in the R-2 Residence Zone and "Age Restricted Communities." These communities were restricted to occupancy, subject to some narrow exceptions, by individuals over age fifty-five. Minimum tract size was twelve acres, with minimum road frontage of 300 feet. A development could include up to eighteen-and-one-half dwelling units per gross tract acre, and 250 market-priced dwelling units in total. A 100 foot setback from any adjacent residential property was required. Building coverage was limited to 45% and impervious surface coverage to 65%.
The title to Ordinance No. 05-22 stated that the ordinance was amending the Borough's Land Development ordinance by the "DESIGNATION" and "CREATION" of the R-9 ARC zone. The body of the ordinance provided that North Plainfield's Zoning Map "shall be amended to reflect an R-9 Age Restricted Community (ARC) Residence Zone." The only parcel designated was the Villa Maria parcel. And, the ordinance spelled out in detail all of the requirements and provisions applicable to the newly-created zoning district.
The ordinance was introduced and adopted on first reading on August 29, 2005. The published notice of adoption on first reading and scheduling the ordinance for a second reading and public hearing contained the title, as we have described, and stated that the ordinance "shall create an age restricted community zone within the Borough of North Plainfield." (emphasis added). The Borough clerk also personally served, by certified and regular mail, all property owners within 200 feet of the Villa Maria parcel, including plaintiff, with notice and a copy of the ordinance.
Prior to the October 17, 2005 public hearing, plaintiff and many other property owners within 200 feet filed with the Borough a valid protest opposing the ordinance. Plaintiff and many other affected property owners and members of the community attended the public hearing and spoke in opposition to the ordinance. The vote of the six council members was four in favor, two against. Although the Borough Council president expressed the view that the ordinance failed to carry the necessary two-thirds vote, the mayor later signed the ordinance, and the Borough took the position that it was validly adopted.
We digress from our narrative account of the pertinent events to explain the circumstances of the vacancy in office existing at that time. North Plainfield's governing body consists of seven voting members of the Borough Council. Effective October 15, 2004, a Republican council member resigned his seat. Carley, supra, 380 N.J.Super. at 242, 881 A.2d 798. The Republican Municipal Committee failed to submit within fifteen days the names of three nominees to fill the vacancy. Ibid. (citing N.J.S.A. 40A:16-11). Thus, the Borough Council exercised the statutory prerogative to appoint a successor within the next fifteen days. Ibid. This occurred at a special meeting, which the court in that case found to be in violation of the Open Public Meetings Act. Ibid. As a result, the purported appointment was invalidated. Id. at 242-43, 881 A.2d 798. The court found a vacancy "by default," to be filled at the next general election in November 2005. Id. at 248, 881 A.2d 798.
On November 28, 2005, the Borough Council introduced and adopted on first *774 reading Ordinance No. 05-24, which was similar to Ordinance No. 05-22. As we will explain, this ordinance was never finally adopted. However, it is significant to our analysis. The title of Ordinance No. 05-24 stated that it was amending North Plainfield's Land Development ordinance "BY AMENDING THE DESIGNATION OF AN R-9 AGE RESTRICTED COMMUNITY (ARC) RESIDENCE ZONE." (emphasis added). The published notice of the public hearing stated that Ordinance No. 05-24 "shall amend the age restricted community ("ARC") zone within the Borough of North Plainfield." (emphasis added). The notice personally sent to plaintiff and other affected property owners said "[t]his ordinance amends Ordinance No. 05-22." (emphasis added).
Ordinance No. 05-24 provided that the property comprising the R-9 ARC zone was the Villa Maria property, but, unlike Ordinance No. 05-22, it did not provide that the zoning map would be amended to reflect that district. Ordinance No. 05-24 set forth a similar set of requirements and provisions for the R-9 ARC zone, but with some changes to reduce the density, increase setbacks and the like, which were designed to render proposed development more palatable to the community. The maximum number of units was reduced to sixteen per acre and 225 total; maximum building coverage was reduced to 40%, and impervious coverage to 55%; and the minimum setback from adjacent residential properties was increased to 125 feet. There was also a change to the ingress and egress requirements. In all other respects, Ordinance No. 05-24 was the same as Ordinance No. 05-22.
The Borough clerk again sent personal notice to property owners within 200 feet, including plaintiff. Another valid protest was filed, and, at the public hearing, plaintiff and many others spoke in opposition to the ordinance.
At the commencement of the public hearing, the Borough Council president made clear to the public that consideration was being given only to the amendatory provisions of Ordinance No. 05-24. He said:
Before I open for public comment I'd like to note that this ordinance is an amendment of an existing ordinance. What it does is we already have an age restricted community overlay on the Villa property, and what this does is actually reduce the density of it. . . . But the amendments that we're discussing tonight are in order to reduce the impact of the previous ordinance.
. . . So the ordinance is already passed that creates an age restricted community on the property. And what we're doing this evening is (indiscernible) the density, impervious surface, increasing the number of exits possible, or at least the location of them, and expanding the setback.
I'm going to ask that people hold their comments to the ordinance at hand, and not speak to the previous ordinance. We do have another public comment section at the end of the meeting where if you have comments regarding the previous ordinance and the merits thereof you can make your comments at that point during that. But this hearing is about the changes to existing ordinance that we're making, not about the existing ordinance itself.
By the time of this public hearing, plaintiff had already filed his initial law suit challenging the validity of Ordinance No. 05-22. At one point during the public hearing, while plaintiff was addressing the Borough Council, the Borough Council president admonished plaintiff to limit his comments to the amendatory provisions:

*775 The public hearing that we're having right now is regarding the amendments to existing ordinance. To an ordinance that is in force. It is under legal challenge. Yes. But we are holding a public hearing regarding specific amendments to a specific ordinance. . . .
. . . .
Mr. Campbell, I've asked you on a number of occasions, I've expressed it very clearly, please, you had a chance in public comment, you chose not to say anything. This is about the amendments ordinance. Please stay on topic.
. . . .
When you have a matter in front of the council, a specific matter, and we're having a specific public hearing regarding that specific matter. Now, please stick to that. . . . I'm not trying to shut down the conversation about this. I'm merely asking that we discuss the ordinance at hand. We have to vote on this ordinance today. And we are looking for input from you regarding these amendments and this ordinance. It won't change what's done in the past or what will happen with your lawsuit. We are looking for input from the public on our ordinance and an action that we have to vote on today.
The public hearing on Ordinance No. 05-24 did not conclude with a vote, however, because it was learned at the end of the public hearing that notice was not sent to the neighboring municipality, thus constituting a jurisdictional defect. Therefore, the Borough Council president announced that, on the advice of counsel, "we are going to close the public hearing and withdraw the amendments, and start the process once again." (emphasis added).
The process resumed by the introduction and adoption on first reading of Ordinance No. 06-01 on January 23, 2006. Ordinance No. 06-01 was identical to Ordinance No. 05-24. Likewise, the published notice and notice that was personally mailed to plaintiff and other property owners within 200 feet was identical.[2] Prior to the public hearing, plaintiff and other affected property owners again filed a valid protest petition opposing Ordinance No. 06-01. At the public hearing, plaintiff and others again spoke in opposition. They used this opportunity to reargue the merits of the R-9 ARC zone.
When the public hearing was closed and the council members cast their votes, those who commented on the reasons for their votes demonstrated a belief that their consideration and their votes were limited to the amendatory provisions, not the entire ordinance. Their comments reflected that the amendatory provisions addressed, at least in part, some of the objections raised by the community at the earlier hearings, for example by reducing density and improving traffic flow. The vote was six in favor to zero against.
One of the two members who had voted against Ordinance No. 05-22 was absent from this meeting. The other member who had voted against Ordinance No. 05-22 clearly expressed his belief that Ordinance No. 05-22 was already on the books and that he was now voting only on the amendments. He said:
Let's go back just a little ways. When 05-22 was introduced, that did pass. What we're voting on tonight are three significant changes to 05-22 which lessen the impact of development on the *776 neighborhood. We've decreased the density, we've increased the setback. And the height restrictions ha[ve] been lowered. And we've opened up offices on axis points of the development.
I hope you all understand that a vote, no, reverts back to the higher density and everything I just mentioned. A vote, yes, is accepting changes to the 05-22 that we got from you at these very meetings.
[Emphasis added.]
Another member, who was not a member of Borough Council when Ordinance No. 05-22 was adopted, said he was in the audience when that ordinance was adopted and heard the concerns expressed. He then went on to say:
The amendment[s] that we're considering tonight are in response to those concerns. What we're doing here tonight, we're reducing the scope of development that is allowed under the current ordinance. I'm in favor of reducingdevelopment under the current ordinance which is the reason why I support these amendments.

[Emphasis added.]
Plaintiff then filed a second law suit challenging the validity of Ordinance No. 06-01. The trial court consolidated the two cases. No material facts were in dispute. On cross-motions for summary judgment, the court decided all issues favorably to plaintiff, as we outlined at the beginning of this opinion. This appeal followed.

II
We first analyze the validity of the second adopted ordinance, Ordinance No. 06-01. That ordinance was adopted by six affirmative votes. Therefore, if, as argued by North Plainfield, it was a reenactment anew of the entire ordinance creating the R-9 ARC zone, thus superseding Ordinance No. 05-22, plaintiff's arguments alleging the invalidity of Ordinance No. 05-22 would be moot.
North Plainfield argues that Ordinance No. 06-01 constituted a complete reenactment and readoption of the entirety of Ordinance No. 05-22, with a few minor changes related to density, setback, and ingress and egress requirements. It points to the fact that Ordinance No. 06-01 was a complete ordinance pertaining to the R-9 ARC zone, rather than merely setting forth the changes to the provisions contained in Ordinance No. 05-22. It further relies on the fact that plaintiff and other members of the public were permitted at the public hearing on Ordinance No. 06-01 to express their disagreement with the creation of the R-9 ARC Zone, rather than being limited to discussion of only the amendments. Finally, North Plainfield argues that, under the time of decision rule, the more recent enactment, approved by a six to zero vote, should preclude plaintiff's challenge to the legality of the first ordinance. We find these arguments unpersuasive.
The time of decision rule has no bearing here. That rule holds that a reviewing court will apply the law in effect at the time of its decision, not the law that was in effect when the issues were originally presented. Manalapan Realty, L.P. v. Twp. of Manalapan, 140 N.J. 366, 378-79, 658 A.2d 1230 (1995); Riggs v. Twp. of Long Beach, 101 N.J. 515, 520-21, 503 A.2d 284 (1986). With respect to land use disputes, the time of decision rule permits municipal changes to a zoning ordinance at any time, even during the pendency of a land use application, and even if the ordinance is amended in direct response to a particular application. Eastampton Ctr., LLC v. Planning Bd. of Twp. of Eastampton, 354 N.J.Super. 171, 196-97, 805 A.2d *777 456 (App.Div.2002). It is permissible for a municipality to change its land use ordinance after an application has been filed, and even after a building permit has been issued, and the amendatory provision will be enforced as long as the applicant did not substantially rely upon the issuance of the building permit. Burcam Corp. v. Planning Bd. of Medford, 168 N.J.Super. 508, 512, 403 A.2d 921 (App.Div.1979). And, when a land use ordinance is revised, but the revision is not yet effective, a pending application must comply with the revised ordinance. Maragliano v. Land Use Bd. of Twp. of Wantage, 403 N.J.Super. 80, 83, 957 A.2d 213 (App.Div.2008).
The time of decision rule pertains to substantive changes in the law and their applicability to ongoing disputes. The dispute here revolves around an alleged procedural irregularity in the adoption of Ordinance No. 05-22. If the adoption of Ordinance No. 06-01 indeed constituted a complete reenactment anew of Ordinance No. 05-22 (with some changes), it would supersede and replace Ordinance No. 05-22, and, under the time of decision rule, its substantive provisions would control. On the contrary, if Ordinance No. 06-01 was an ordinance amending Ordinance 05-22, the time of decision rule could not serve to "cure" any procedural deficiency in the adoption of Ordinance No. 05-22.
We turn then to the question of whether Ordinance No. 06-01 was a reenactment anew of the ordinance establishing the R-9 ARC zone or whether it was an amendment to a pre-existing ordinance creating that zone. Opposing North Plainfield's reliance on the restatement of the entire prior ordinance (with a few changes) and the fact that opponents were permitted to speak to the entire subject (and not only the amendatory provisions), there are a number of factors that constitute indicia of amendment, as opposed to reenactment anew.
Unlike the title of Ordinance No. 05-22, which provided for the "DESIGNATION" and "CREATION" of the R-9 ARC zone, the title of Ordinance No. 06-01 stated that it was "AMENDING" the designation of the R-9 ARC zone. Similarly, the published notice regarding Ordinance No. 05-22 stated that the ordinance "shall create an age restricted community zone within the Borough of North Plainfield," whereas the published notice pertaining to Ordinance No. 06-01 stated that the ordinance "shall amend the age restricted community ("ARC") zone within the Borough of North Plainfield." (emphasis added). And, the notice pertaining to Ordinance No. 06-01 personally sent to plaintiff and other affected property owners said "[t]his ordinance amends Ordinance No. 05-22." (emphasis added).
Within the body of Ordinance No. 05-22, the Borough zoning map was expressly amended by designating the block and lot constituting the Villa Maria property as the newly created R-9 ARC zone. Ordinance No. 06-01 contained no such provision, thus suggesting that the zoning map already reflected the existence and location of the zone. Ordinance No. 05-22 was not repealed.
All of these indicia of an amendatory ordinance also existed with respect to Ordinance No. 05-24, which was not adopted because of a notice defect. Ordinance No. 05-24 was identical to Ordinance No. 06-01. At the public hearing on Ordinance No. 05-24, the Borough Council made it abundantly clear that consideration was being given to only the amendatory provisions, and members of the public were not even permitted to express their sentiments regarding the overall ordinance. At the public hearing on Ordinance No. 06-01, although residents were allowed to express *778 their views on the overall ordinance, it is clear that the voting members of the governing body believed they were voting only on the amendatory provisions. No member of the council suggested that consideration of Ordinance No. 06-01 allowed council members to reconsider anew the creation of the R-9 ARC zone on the Villa Maria property or that they were then considering anything other than specific amendments to an existing ordinance. No member of the council expressed the belief that he or she was voting again on the entirety of the zoning change.
In Board of Commissioners v. Grodecki, 21 N.J. Misc. 241, 243, 33 A.2d 115 (C.P. 1943), the court considered an ordinance that prohibited the possession of betting slips or other evidence of wagering. The ordinance amended an earlier ordinance, the penal clause of which proved to be inconsistent with the later-enacted Home Rule Act. Ibid. The amending ordinance repeated the entire substance of the earlier prohibition, with the exception of a new and proper penal clause. Id. at 249, 33 A.2d 115. It was, in the words of the court, "complete and perfect in itself." Id. at 243, 33 A.2d 115.[3] The court noted the "substantial difference between an amendment which is complete in itself, and one which changes but a few words in a previous ordinance, and is incomplete in itself. Obviously the latter . . . does not itself express the clear will of the legislative body." Id. at 244, 33 A.2d 115. On the contrary, "if the enactment, which is later adopted, is complete in itself and without defect in its substance, it does clearly express the will of the enacting authority, and does give full notice to the citizens for whose benefit it is adopted." Ibid.
North Plainfield argues that Ordinance No. 06-01 constituted "a line-by-line reenactment of the entire [first ordinance] with some changes." Viewing the text of Ordinance No. 06-01 in isolation sways the "completeness" argument in North Plainfield's favor. However, looking at the entire circumstances, we perceive material differences between Grodecki and the facts of this case. North Plainfield was not approving modifications, appearing in a "new" and "complete" ordinance, for the purpose of remedying a recognized infirmity in the original ordinance. North Plainfield never acknowledged a defect in the validity of the first ordinance. There was no statement in the text, title, notice or public comments by the council members that the purpose of Ordinance No. 06-01 was to supersede and replace Ordinance No. 05-22 in order to remedy a defect.
This record does not support North Plainfield's argument that Ordinance No. 06-01 expresses the "clear will" on the part of the council to approve anew the R-9 ARC zoning designation. On the contrary, the record demonstrates that the council considered the existence of the R-9 ARC zone a settled issue. There was no intent to repeal the first ordinance. The council attempted to tinker with the first ordinance to make some aspects of its requirements more palatable to the community. In these circumstances, the second ordinance depended on the first ordinance.
We distinguish this case from S & L Associates, Inc. v. Township of Washington, 35 N.J. 224, 172 A.2d 657 (1961). The plaintiff in that case challenged the township's 1957 ordinance, and a 1958 amendment, excluding the plaintiff's lands from an industrial zone. Id. at 225-26, 172 A.2d *779 657. After this court invalidated the ordinances solely because of the participation of certain self-interested planning board officials, the township enacted an ordinance with the same substantive provisions as the invalidated ordinances, but it did so without the involvement of the self-interested officials, who had resigned. Id. at 226-27, 172 A.2d 657. The Supreme Court concluded that the absence of the interested officials rendered the new ordinance valid. Id. at 227, 172 A.2d 657.
In the case before us, however, there had been no judicial determination that Ordinance No. 05-22 was invalid, and the council members did not recognize that it was invalid. On the contrary, they expressed their explicit understanding that the propriety of the R-9 ARC zoning designation was not to be considered. This was consistent with the terminology in the titles and notices of Ordinance Nos. 05-24 and 06-01, as well as the absence in their text of an amendment to the zoning map. And, we reject North Plainfield's attempt to focus the attention on the tenor of the public comments at the hearing on Ordinance No. 06-01. It is clear that these individuals wanted to voice their displeasure with the council and did so despite the limited scope of the hearing. But the controlling circumstance is that the council members understood the intertwined nature of the two ordinances and were voting only on the changes.
Under these circumstances, we conclude that Ordinance No. 06-01 constituted an ordinance amending Ordinance No. 05-22. Consequently, the validity of Ordinance No. 06-01 depends upon the validity of Ordinance No. 05-22.

III
We next consider whether a two-thirds majority vote was required for the adoption of Ordinance No. 05-22. The notice and protest provision of the MLUL provides:
Notice of the hearing on an amendment to the zoning ordinance proposing a change to the classification or boundaries of a zoning district, exclusive of classification or boundary changes recommended in a periodic general reexamination of the master plan by the planning board pursuant to section 76 of P.L.1975, c. 291 (C. 40:55D-89), shall be given prior to adoption in accordance with the provisions of section 2 of P.L. 1995, c. 249 (C. 40:55D-62.1). A protest against any proposed amendment or revision of a zoning ordinance may be filed with the municipal clerk, signed by the owners of 20% or more of the area either (1) of the lots or land included in such proposed change, or (2) of the lots or land extending 200 feet in all directions therefrom inclusive of street space, whether within or without the municipality. Such amendment or revision shall not become effective following the filing of such protest except by the favorable vote of two-thirds of all the members of the governing body of the municipality.
[N.J.S.A. 40:55D-63.]
The creation of the R-9 ARC zone stemmed from the periodic general reexamination of North Plainfield's Master Plan and the recommendations of the 2002 report. Therefore, under the notice provision of this section, North Plainfield was exempted from furnishing personal notice to property owners within 200 feet of the proposed change in zoning classification. Cotler v. Twp. of Pilesgrove, 393 N.J.Super. 377, 379, 923 A.2d 338 (App.Div.2007); Gallo v. Mayor & Twp. Council of Lawrence Twp., 328 N.J.Super. 117, 126, 744 A.2d 1219 (App.Div.2000). Notwithstanding the absence of an obligation to do so, North Plainfield provided personal notice *780 to affected property owners, including plaintiff.
North Plainfield argues that the exemption from personal notice also restricts plaintiff's rights under the protest provision of the statute. It argues that "the protest provisions, and hence the enhanced majority, are not implicated and do not apply when the zoning ordinance is to be changed consistent with a specific recommendation in a Master Plan reevaluation." North Plainfield contends that this result follows from a plain reading of Gallo and Cotler. We do not agree.
Both of those cases dealt with only the notice requirement. In Gallo, we determined that N.J.S.A. 40:55D-63 did not require personal notice where the zoning change was recommended by the statutorily mandated six-year review of the municipal master plan. Gallo, supra, 328 N.J.Super. at 119, 127, 744 A.2d 1219. We noted that in creating the exemption from the personal notice requirement, the Legislature was well aware of the "distinction between an isolated zoning change and a broad-based review of a municipality's entire zoning scheme." Id. at 124, 744 A.2d 1219. The periodic master plan reviews mandated by N.J.S.A. 40:55D-89 require extensive public review and analysis, and generally are marked by extensive publicity and notoriety. Id. at 125, 744 A.2d 1219. Thus, while the Legislature deemed personal notice appropriate in isolated cases to assure notice to property owners affected by an isolated zoning change, a similar requirement was not deemed necessary in the latter circumstances. Id. at 126, 744 A.2d 1219. We commented:
The language of N.J.S.A. 40:55D-63, providing for the public's right to notice and protest, was amended in 1995 to exempt "classification or boundary changes recommended in a periodic general reexamination of the master plan."
The statute additionally addresses the particular requirements of the parties entitled to protest and the requirements for overriding a protest.
[Id. at 123, 744 A.2d 1219.]
Relying on the first sentence of this passage, North Plainfield argues that its reliance on the recommendations of the periodic reexamination of its master plan destroys (1) the affected property owners' right to personal notice, (2) the right to protest, and (3) the right to have the ordinance passed by a two-thirds margin. We reject the second and third contentions.
We reached no such conclusion in Gallo. Our conclusion related to the plaintiffs' right to notice. We did not hold that the public's right to protest was extinguished because the zoning change was the product of a periodic general reexamination of the master plan. Unlike in the case before us, the plaintiffs in Gallo did not file a protest petition, and we did not hold that they were not entitled to file one. Our reference in the quoted passage to "the public's right to notice and protest" should not be read to require that these rights exist in tandem. On the contrary, as we will further explain, the rights are separate and independent of each other.
Our opinion in Cotler is also of no assistance to North Plainfield. As in Gallo, we held that the municipality was not required to provide personal notice to affected property owners because the challenged amendment to the zoning ordinance resulted from a periodic reexamination of the master plan. Cotler, supra, 393 N.J.Super. at 379, 923 A.2d 338. We further held that the published notice lacked sufficient information concerning the nature and scope of the changes to the zoning ordinance to satisfy the requirements of N.J.S.A. 40:49-2.1, and was thus legally insufficient. Id. at 387, 923 A.2d 338. We did not address the public's right to protest *781 and the corresponding right to approval by a supermajority.[4]
The notice provision, embodied in the first sentence of N.J.S.A. 40:55D-63, was added to the protest provision of that section in 1995. See L. 1995, c. 249, § 1.[5] No case has squarely dealt with the effect of the 1995 amendment on the right to protest.
The right to protest zoning changes has existed in New Jersey since 1928. Levin v. Twp. of Parsippany-Troy Hills, 82 N.J. 174, 182, 411 A.2d 704 (1980). This right, and the corresponding right to approval by an enhanced majority, derived from the desire to protect affected property owners from "unwanted or ill-considered change." Johnson v. Twp. of Montville, 109 N.J.Super. 511, 517, 264 A.2d 75 (App.Div.1970). "[T]he Legislature intended that, as a general rule, a protested zoning change should be more difficult to pass than an amended zoning ordinance, not subject to protest. . . ." Mountain Hill, LLC v. Middletown Twp., 353 N.J.Super. 57, 66, 801 A.2d 412 (App.Div.), certif. denied, 175 N.J. 78, 812 A.2d 1110 (2002).
The public policy underlying the right to protest, however, does not explain, in explicit terms, why the right survives the amendment pertaining to notice. In Mountain Hill, we considered the approval of an amended zoning ordinance over protest by a three-to-one vote, with one member of the governing body recusing himself. Id. at 60-61, 801 A.2d 412. We agreed with the trial court that the vote did not constitute the required two-thirds majority to adopt the ordinance over protest. Id. at 61-62, 801 A.2d 412. The sole issue raised on appeal by the municipality was that the amendment did indeed pass by a two-thirds vote of "all the members of the governing body." Id. at 61, 801 A.2d 412. But there was no claim that the protest provision did not apply.
We nonetheless opined that the 1995 amendment had "no bearing" on our interpretation of the right to require that challenged ordinances pass by a supermajority of "all the members." Id. at 62, 801 A.2d 412. Given that the 1995 amendment did not affect the plaintiff's right to require approval by an enhanced majority, it follows with even greater force that the amendment does not preclude the right to protest itself.
The applicable canons of statutory construction support this conclusion. The 1995 amendment adding the notice provision to N.J.S.A. 40:55D-63, see L. 1995, c. 249, § 1, also enacted in its entirety what has been codified as N.J.S.A. 40:55D-62.1, see L. 1995, c. 249, § 2, as an all-encompassing notice statute. Thus, it is unclear why an amendment to N.J.S.A. 40:55D-63 was necessary. Unless there is some effect on the protest provision in that section, the amendment appears to be superfluous or meaningless. Such an interpretation should be avoided. State v. Reynolds, 124 N.J. 559, 564, 592 A.2d 194 (1991); Norman J. Singer & J.D. Shambie Singer, 2A Sutherland Statutory Construction *782 § 46:6 at 230 (7th ed. 2007) ("`It is an elementary rule of construction that effect must be given, if possible, to every word, clause and sentence of a statute.'" (footnotes omitted)).
There is a general aversion to repeals by implication and a recognized objective to give effect to each word of an enactment. In construing statutes, courts accord to statutory language its ordinary plain meaning, absent specific intent to the contrary. Mortimer v. Bd. of Review, 99 N.J. 393, 398, 493 A.2d 1 (1985); Levin, supra, 82 N.J. at 182, 411 A.2d 704. The "primary task" remains "to `effectuate the legislative intent in light of the language used and the objects sought to be achieved.'" Merin v. Maglaki, 126 N.J. 430, 435, 599 A.2d 1256 (1992) (quoting State v. Maguire, 84 N.J. 508, 514, 423 A.2d 294 (1980)).
The Legislature did not change the "protest" language in 1995. It simply appended an additional notice requirement to the beginning of the statute. As such, "the provisions introduced by the amendatory act should be read together with the provisions of the original section that were reenacted or left unchanged, in the amendatory act, as if they had been originally enacted as one section. Effect is to be given to each part, and they are to be interpreted so that they do not conflict." Norman J. Singer, 1A Sutherland Statutory Construction § 22:34 at 401-03 (6th rev. ed.2002) (footnotes omitted).
It is not difficult to give effect to each portion of the amended N.J.S.A. 40:55D-63. The right to protest has enjoyed long-standing historical support in this state and other jurisdictions. Levin, supra, 82 N.J. at 180, 411 A.2d 704. It is unlikely that the Legislature intended to undercut that right. The notice exemption reflected the understanding that "the very nature of periodic review of a master plan preclude[s] it from remaining a secretive process and outside of public oversight and scrutiny." Gallo, supra, 328 N.J.Super. at 126, 744 A.2d 1219. The Legislature enacted the notice exemption to save local government the time and expense of providing personal notice to a group of individuals that should be aware, because of this lengthy period of oversight, of the possibility of future zoning changes. Ibid.
The mere addition of this language does not demonstrate, however, a desire to remove from the affected property owners the right to maintain "the stability and continuity of zoning regulations." Friends of Dinky Woods v. Twp. of W. Windsor, 291 N.J.Super. 325, 329, 677 A.2d 289 (Law Div.1996). On the contrary, the statute, as amended, reserves the right to protest "any proposed amendment or revision." N.J.S.A. 40:55D-63 (emphasis added). This signifies that the right continues undiminished.
We have no reason to doubt that, even in the absence of a personal notice requirement, the right to protest provides the community with one final measure by which to challenge zoning changes it might deem unwise. Given that the planning board undertakes the periodic review and develops recommended changes to the municipal zoning ordinance, but the governing body approves any final changes, the protest provision provides the community with the opportunity to present its objections to a new and possibly more favorable audience. The right to have the amended ordinance pass by an enhanced majority runs alongside the right to protest. Absent clear and compelling evidence of the Legislature's intent to remove these protections, we have no occasion to conclude that the 1995 amendment repealed them by implication. Twp. of Mahwah v. Bergen County Bd. of Taxation, 98 N.J. 268, 280, 486 A.2d 818, cert. denied sub nom. *783 Borough of Demarest v. Twp. of Mahwah, 471 U.S. 1136, 105 S.Ct. 2677, 86 L.Ed.2d 696 (1985).
Our analysis is bolstered by consideration of the respective legislative purposes underlying the rights of notice and protest, because our construction of a statute must strive to implement the intent of the Legislature, in consideration of the statutory language as well as "the objectives sought to be achieved." Merin, supra, 126 N.J. at 435, 599 A.2d 1256.
The notice provisions are geared toward establishing reasonable methods to inform the community of intended zoning changes. In the case of property owners directly affected, including those within 200 feet, personal notice is generally required as the best means available, but may be dispensed with when the zoning change is the product of the expansive periodic reexamination process that carries with it much public notoriety. In those cases, and with respect to members of the community not directly affected, published notice is deemed adequate.
The purpose of the protest provision is, as we have explained, to better enable affected property owners to maintain the stability and continuity of zoning regulations and to therefore make it more difficult, if they protest, for those changes to be enacted.
These are two different purposes. Knowing about a proposed zoning change and liking it are not the same. Different considerations underlie the right to reasonable notice and the right to protest. It is sensible as well as consistent with the statutory language to construe the two rights as independent of each other. We therefore hold that the right to personal notice and the right to protest under N.J.S.A. 40:55D-63 are independent rights. There is sometimes a right to personal notice regarding a zoning amendment, but there is always a right to protest.

IV
Because a valid protest was filed, Ordinance No. 05-22 could be approved only "by the favorable vote of two-thirds of all the members of the governing body of the municipality." N.J.S.A. 40:55D-63. North Plainfield argues that the judicial declaration of a vacancy temporarily reduced the full authorized membership, or the "denominator," from seven to six. As such, it argues that the four affirmative votes were sufficient. We disagree.
In Mountain Hill, supra, we thoroughly discussed the phrase "all the members of the governing body." As we have noted, the township committee in that case approved an amendment to a zoning ordinance by a vote of three to one, with one recusal. 353 N.J.Super. at 58, 801 A.2d 412. Following the trial court's invalidation of the ordinance, the township argued that the statute's use of the phrase "all the members of the governing body" reflected the Legislature's intent to permit the approval of a protested amendment by a two-thirds vote of "all of those members present and qualified to vote," not a two-thirds vote of the full membership authorized by statute. Id. at 62, 801 A.2d 412. The township asked us, in effect, to deem abstaining members "unqualified" to vote. Ibid.
We rejected that proposition. We noted the refusal by two prior courts to interpret the same facts in the manner urged by the township. Id. at 63, 801 A.2d 412 (discussing Johnson, supra, 109 N.J.Super. at 516, 264 A.2d 75; Farmer v. Meeker, 63 N.J.Super. 56, 62-63, 163 A.2d 729 (Law Div.1960)). We concluded that the phrase "all the members" meant "`the complete board, the full membership, not a *784 reduced number of members as they are at the time of voting.'" Id. at 65, 801 A.2d 412 (quoting Ross v. Miller, 115 N.J.L. 61, 65, 178 A. 771 (Sup.Ct.1935) (quoting Schermerhorn v. Mayor & Aldermen of Jersey City, 53 N.J.L. 112, 116, 20 A. 829 (Sup.Ct.1890))). The enhanced protections accorded to property owners, in the form of the requirement that the amendment pass by a supermajority, would have been diluted if, as the township urged, the denominator did not include "deaths, absences or recusals." Id. at 66, 178 A. 771.
North Plainfield argues that the judicial declaration of a vacancy in this case warrants our deviation from the rationale and holding of Mountain Hill. Its urged justification rests on the proposition that the judicial action made it impossible to fill the vacancy at the time of the vote, and, as a matter of law, the governing body of North Plainfield at that time consisted of only six members. We find this rationale unpersuasive.
In Ross, supra, the Court concluded that the Legislature intended the phrase "all the members" to mean "the full membership commanded by the act, and not a reduced body, however occurring." 115 N.J.L. at 64, 178 A. 771 (emphasis added). The vacancy in this case was not "caused" by judicial order. It was caused by the failure of local officials to act pursuant to law to fill it. The court merely declared that the vacancy existed by "default," and, by operation of law, could not be filled until the next general election. Carley, supra, 380 N.J.Super. at 248, 881 A.2d 798. We perceive no fundamental difference between a vacancy resulting from a judicial declaration and a vacancy resulting from death, recusal, resignation, absence, or incapacity. Indeed, the Municipal Vacancy Law, N.J.S.A. 40A:16-1 to -23, treats judicial declarations and vacancies resulting from death, resignation, absence and incapacity in like manner. N.J.S.A. 40A:16-3.
We find unpersuasive North Plainfield's reliance on In re Fichner, 282 N.J.Super. 422, 660 A.2d 545 (App.Div.1995), aff'd as modified, 144 N.J. 459, 677 A.2d 201 (1996), and City of Hoboken v. City of Jersey City, 347 N.J.Super. 279, 789 A.2d 668 (Law Div.2001). The planning board in the latter case recommended a series of amendments to a local redevelopment plan. City of Hoboken, supra, 347 N.J.Super. at 284, 789 A.2d 668. The planning board acted by the affirmative vote of six of the nine members, the majority of whom did not have legal authority to act. Id. at 288-90, 789 A.2d 668. Contrary to North Plainfield's suggestion, the fact that the seats of these "unqualified" members stood vacant as a matter of law did not mean that the planning board could conduct business on the basis of a watered-down quorum or majority. There needed to be five bona fide, legally appointed members present to constitute a quorum, regardless of the number of vacancies. Id. at 295, 789 A.2d 668.
In the former case, a licensed master plumber challenged an administrative decision to suspend his license. In re Fichner, supra, 282 N.J.Super. at 423-24, 660 A.2d 545. He argued that three of the seven members of the State Board of Examiners of Master Plumbers did not satisfy the statutory qualifications, and that a fourth member did not attend the hearings. Id. at 424, 660 A.2d 545. As such, the plaintiff argued that the board's decision was not the product of "a majority of the members of the entire board." Id. at 429-30, 660 A.2d 545 (quoting N.J.S.A. 45:1-2.2). We agreed. Like the Law Division in City of Hoboken, we did not find that the disqualification of particular members altered the relevant denominator or our calculation of *785 a proper majority. The holding reflects the contrary conclusion.
We also note that the MLUL provides that a use variance "shall be granted only by affirmative vote of at least five members, in the case of a municipal board, or two-thirds of the full authorized membership, in the case of a regional board." N.J.S.A. 40:55D-70d. A municipal board of adjustment consists of seven regular members and up to four alternate members. N.J.S.A. 40:55D-69. However, only seven members vote on any application. Ibid. Regional boards consist of at least seven members, but may consist of more. N.J.S.A. 40:55D-79 and -85.
When the Legislature set the required number of affirmative votes needed for a seven-member voting body, it expressly designated five as the number of votes needed to constitute an enhanced majority. The scheme allows for no reduction in case of vacancies or recusals. However, when the number of voting board members is not determined by statute, the Legislature accomplished the same purpose by setting the same required ratio, namely two-thirds. By analogy, because under different forms of municipal government the number of members comprising governing bodies varies from municipality to municipality, the Legislature could not set a fixed number in the context here presented, but set a ratio that would apply to all forms of government and intended that the ratio apply to the statutorily authorized number of members, notwithstanding vacancies at any given time.
Finally, we note that the rule of necessity has no application in this case, because the Borough Council consisted of six members when it voted on Ordinance No. 05-22 and only five votes were required for passage by a two-thirds majority. See Mountain Hill, supra, 353 N.J.Super. at 66, 801 A.2d 412.

V
The trial court stated in its decision that North Plainfield was free to adopt anew an ordinance creating an R-9 ARC zone, provided it made clear that it was acting anew in considering passage of the entire ordinance and that the requisite number of affirmative votes were garnered. We agree. At oral argument, we were advised that, notwithstanding the availability of that remedy, North Plainfield has not so acted.
Affirmed.
NOTES
[1] N.J.S.A. 40:55D-63 provides in part:

A protest against any proposed amendment or revision of a zoning ordinance may be filed with the municipal clerk, signed by [a specified amount of owners of property within the area of proposed change or within 200 feet of it]. Such amendment or revision shall not become effective following the filing of such protest except by the favorable vote of two-thirds of all the members of the governing body of the municipality.
[2] Of course the dates of introduction and scheduled public hearing differed. And, the personal notice for Ordinance No. 06-01 contained this additional statement: "Ordinance No. 05-24, with a similar title, introduced on November 28, 2005 was withdrawn during the public hearing held on January 9, 2006 because of a notice deficiency."
[3] The court noted that the city's sole mistake was the decision to label it "an amendment to a previously existing enactment rather than as an independent enactment." Id. at 244, 33 A.2d 115.
[4] Similarly, we addressed only the notice provision in Robert James Pacilli Homes, L.L.C. v. Township of Woolwich, 394 N.J.Super. 319, 926 A.2d 412 (App.Div.2007). The challenged amendments in that case were not, as here, the product of a periodic master plan review. Id. at 331, 926 A.2d 412. That case dealt with whether zoning changes within the boundaries of zoning districts constituted changes in the classification of those districts. Id. at 329-33, 926 A.2d 412.
[5] At the same time, N.J.S.A. 40:55D-62.1 was enacted, see L. 1995, c. 249, § 2, establishing notice provisions "parallel" to those in N.J.S.A. 40:55D. See Gallo, supra, 328 N.J.Super. at 122-23, 744 A.2d 1219.